**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **In the Matter Of**: | } | |
| | } | 21-11308 |
| RWDY, Inc. | } | |
| | } | Chapter 11 |
| **Debtor** | } | |

**DISCLOSURE STATEMENT IN SUPPORT**
**OF DEBTOR'S PLAN OF REORGANIZATION**
**DATED OCTOBER 17, 2023**

Dated: October 17, 2023

Respectfully submitted

ROBERT W. RALEY ESQ.

By: /s/ Robert W. Raley
Robert W. Raley, La. Bar #11082
290 Benton Spur Road
Bossier City, LA 71111
Telephone: 318-747-2230
bankruptcy@robertraleylaw.com
Attorney for the Debtor

And

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC
By: /s/ Curtis R. Shelton
La. Bar Roll No. 17137
Suite 1400, Regions Tower
333 Texas Street (71101)
P.O. Box 1764
Shreveport, LA 71166-1764
Telephone: (318) 227-3500
Facsimile: (318) 227-3806
E-mail: curtisshelton@awsw-law.com
Attorneys for the Debtor

# Contents

ARTICLE I ..................................................................................................................................... 1

INTRODUCTORY STATEMENT AND DISCLOSURES ..................................................................... 1

    A.   BRIEF EXPLANATION OF CHAPTER 11 ............................................................................ 2

    B.   THE PLAN OF REORGANIZATION ................................................................................... 2

    C.   THE DISCLOSURE STATEMENT ...................................................................................... 3

    D.   IMPORTANT DISCLOSURES ........................................................................................... 4

ARTICLE II .................................................................................................................................... 6

DEFINITIONS ............................................................................................................................... 6

ARTICLE III ................................................................................................................................... 6

DEBTOR'S BACKGROUND INFORMATION .................................................................................. 6

    A.   HISTORY OF THE DEBTOR ............................................................................................ 6

    B.   EVENTS LEADING UP TO BANKRUPTCY ....................................................................... 6

ARTICLE IV .................................................................................................................................. 7

ASSETS AND LIABILITIES OF THE DEBTOR .................................................................................. 7

    A.   OVERVIEW OF ASSETS AND LIABILITIES AT THE TIME OF FILING .................................. 7

    B.   DEBTOR'S ASSETS AT THE TIME OF THE FILING AND AFTERWARDS ............................. 8

    C.   CLAIMS ASSERTED AGAINST THE DEBTOR .................................................................. 8

ARTICLE V .................................................................................................................................... 9

SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ............................................................. 9

    A.   FIRST DAY PLEADINGS AND HEARING .......................................................................... 9

    B.   FILING OF ADVERSARY PROCEEDING COMPLAINT AGAINST BRIAN T. OWEN ............... 9

    C.   FILING OF FIRST AND SECOND MOTION TO EXTEND THE EXCLUSIVITY PERIOD ............ 9

    D.   RULE 2004 DOCUMENT PRODUCTION, EXAMINATIONS, MOTIONS FOR PROTECTIVE ORDERS AND MOTION FOR ORDER OF CONTEMPT ..................................................... 10

    E.   SCHEDULES, IDI AND 341 MEETING ........................................................................... 10

    F.   RETENTION OF PROFESSIONALS ................................................................................ 10

    G. POST-PETITION FINANCING ........................................................................................ 11

ARTICLE VI .................................................................................................................................. 11

SUMMARY OF THE PLAN ........................................................................................................... 11

    A.   OVERVIEW OF THE PLAN .......................................................................................... 11

    B.   CLASSES AND DISTRIBUTIONS ................................................................................... 11

    C.   TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN ........................................ 13

    D.    TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN ................................................ 15

    E.    IMPLEMENTATION OF THE PLAN ................................................................................ 27

    F.    DISPOSITION OF CAUSES OF ACTION ......................................................................... 29

    G.   EXECUTORY CONTRACTS AND LEASES ....................................................................... 30

    H.   RESOLUTION OF DISPUTED CLAIMS ........................................................................... 32

    I.    RETENTION OF JURISDICTION .................................................................................... 34

    J.    DISCHARGE ................................................................................................................ 36

**ARTICLE VII** ............................................................................................................................ 37

**VOTING PROCEDURES AND REQUIREMENTS** .......................................................................... 37

    A.   CREDITORS SOLICITED TO VOTE ............................................................................... 37

    B.   DEFINITION OF IMPAIRMENT ................................................................................... 37

    C.   CLASSES IMPAIRED UNDER THE PLAN ....................................................................... 38

    D.   VOTE REQUIRED FOR CLASS ACCEPTANCE ............................................................... 38

    E.   SPECIFIC CONSIDERATIONS IN VOTING ..................................................................... 38

**ARTICLE VIII** ........................................................................................................................... 39

**LIQUIDATION AND PLAN ALTERNATIVES** ............................................................................... 39

    A.  LIQUIDATION ANALYSIS ........................................................................................... 39

    B.  ALTERNATIVES TO CONFIRMATION OF THE PLAN ..................................................... 40

    C.  LIQUIDATION ALTERNATIVE THROUGH CHAPTER 7 .................................................. 40

    D.   DISMISSAL ALTERNATIVE .......................................................................................... 41

    E.   FUTURE PROJECTIONS ............................................................................................... 41

**ARTICLE IX** ............................................................................................................................. 41

**RISK FACTORS** ........................................................................................................................ 41

    A.   ESTIMATED RECOVERY RISKS ................................................................................... 41

    B.   BANKRUPTCY RISKS .................................................................................................. 42

**ARTICLE X** .............................................................................................................................. 43

**CERTAIN TAX CONSEQUENCES OF THE PLAN** ......................................................................... 43

**ARTICLE XI** ............................................................................................................................. 43

**MISCELLANEOUS PROVISIONS** ............................................................................................... 43

**ARTICLE XII** ............................................................................................................................ 45

**CONCLUSION** ......................................................................................................................... 45

4

**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **In the Matter Of**: | } | |
| | } | Case No. 20-10616 |
| RWDY, Inc. | } | |
| | } | Chapter 11 |
| **Debtor** | } | |

**DISCLOSURE STATEMENT IN SUPPORT**
**OF DEBTOR'S PLAN OF REORGANIZATION**
**DATED OCTOBER 17, 2023**

RWDY, Inc. (the "Debtor"), hereby submits this Disclosure Statement (the "Disclosure Statement") in support of the Debtor's Plan of Reorganization dated October 17, 2023 (the "Plan").

**ARTICLE I**
**INTRODUCTORY STATEMENT AND DISCLOSURES**

On December 21, 2022, the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division (the "Bankruptcy Court"), thereby initiating this bankruptcy case (the "Chapter 11 Case").

Pursuant to the terms of the Bankruptcy Code, this Disclosure Statement has been approved by the Bankruptcy Court. Such approval is required by statute and will not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

Contained in the packet of documents which has been sent to you by the Debtor is the Disclosure Statement in Support of Debtor's Plan of Reorganization (the "Disclosure Statement"), the Debtor's Plan of Reorganization (the "Plan"), the Ballot for Voting on the Plan of Reorganization (the "Ballot") and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof. Please read all of these materials carefully. Please note that in order for your vote to be counted, you must 1) include your name and address, 2) fill in, date, and sign the enclosed Ballot and 3) return it to the attorney for the Debtor by the date and time specified on the Ballot.

This disclosure statement includes the ***exhibits*** that are attached hereto. You should consider attached exhibits as part of this disclosure statement whether such documents and information are specifically discussed in the following narrative text.

## A.    BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor in possession attempts to reorganize its business for the benefit of the debtor, its creditors and other parties in interest.  The present Chapter 11 Case commenced with the filing of the voluntary Chapter 11 petition by the Debtor on the Petition Date.

The commencement of a Chapter 11 case creates an estate comprised of all legal and equitable interests of the debtor in property as of the date the petition is filed.  Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the present Chapter 11 Case, the Debtor remains in possession of its property and continues to operate its business as a debtor in possession.

Additionally, upon the commencement of a case under chapter 11 of the Bankruptcy Code, Section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect from a debtor any claims which arose prior to the bankruptcy filing or otherwise to interfere with a debtor's property or business.  Unless otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the Effective Date of a confirmed plan of reorganization.

## B.    THE PLAN OF REORGANIZATION

<u>Purpose of the Plan</u>:  The Debtor has filed contemporaneously herewith its Plan of Reorganization with the Bankruptcy Court. That plan is sometimes referred to in this disclosure statement as "the Plan" or the "proposed Plan" or by similar language. All references in this disclosure statement to the Plan, the proposed Plan, etc. should be understood to be to the Plan of Reorganization dated October 17, 2023 that is filed herewith.

The purpose of the Debtor's Plan is to provide a mechanism for the reorganization of the Debtor's assets and for the payment of the Debtor's Creditors.  The Plan was developed by the Debtor and proposes, among other things, the means by which all Claims against the Debtor will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code.  The Plan is essentially a new contract between the Debtor and its Creditors, proposed by the Debtor to its Creditors for approval. Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote

2

and are eligible to vote, and, if appropriate, by objecting to confirmation of the Plan. However, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that reject the Plan. Approval and consummation of the Plan will enable the Chapter 11 Case to be finally concluded.

The Debtor believes that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 liquidation or dismissal of this Chapter 11 Case. The alternatives to the Plan are more fully discussed in Article VII of this Disclosure Statement. Each creditor is urged to read the plan prior to voting.

## C. THE DISCLOSURE STATEMENT

Why You Have Received This Disclosure Statement: You have received this Disclosure Statement because the Debtor has proposed a Plan with the Bankruptcy Court to satisfy its debts and provide for a reorganization of the Debtor's business. The Bankruptcy Court held a hearing and approved this Disclosure Statement on [**Date to be inserted here after Court Approval**]. A copy of the Plan is enclosed with the materials that you have received. This Disclosure Statement, as required by 11 U.S.C. § 1125, is being provided to all known Creditors and other parties-in-interest whose claims are Impaired in connection with the solicitation and acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement: The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the Holders of Claims against the Debtor to make an informed judgment whether to accept or reject the Plan.

Sources of Information: The information contained in this Disclosure Statement has been submitted by the Debtor unless specifically stated to be from other sources. Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments. While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, the Debtor urges that any reliance on the contents of such other instrument should depend on a thorough review of the instruments themselves.

Voting on the Plan: *Your Acceptance of the Plan Is Important*. A Creditor or Interest Holder, in order to vote on the Plan, must have filed a proof of claim or interest on or before the Bar Date, unless the Debtor included such Creditor's Claim on the Debtor's schedule and did not schedule the claim as disputed, liquidated or contingent. Any Creditor whose Claim is not scheduled as disputed, liquidated or contingent is, to the extent scheduled, deemed to have filed a Claim and, absent objection, such Claim is deemed Allowed. A Creditor or Interest Holder may vote to accept or reject the Plan by filling out and mailing to counsel for the Debtor the Ballot which has been provided in this package of information.

3

In order for the Plan to be accepted by a class of Creditors, more than one half in number and at least two-thirds in amount of such class of Claims must vote to accept the Plan. Only those Claim Holders that actually vote are considered in the calculations. In order for the Plan to be accepted by Interest Holders, at least two-thirds in amount of interests must vote to accept the plan. Again, only voting Interest Holders are considered in the calculation. You are, therefore, urged to fill in, date, sign and promptly mail and/or email the enclosed Ballot which has been furnished to you to counsel for the Debtor as follows:

> Robert W. Raley, Esq.
> 290 Benton Spur Road
> Bossier City, LA 71111
> bankruptcy@robertraleylaw.com

Please be sure to complete properly the form and identify legibly the name of the claimant or interest holder.

The Court has fixed [**Date to be Fixed by the Court and Inserted Here**], as the last date by which Ballots must be served on counsel for the Debtor. Except to the extent allowed by the Bankruptcy Court, Ballots that are received after such time will not be counted. Ballots of Holders of Impaired Claims received pursuant to this solicitation and which are signed but are not expressly voted for acceptance or rejection of the Plan will be counted as Ballots for accepting the Plan. A Ballot accepting the Plan may not be revoked, except by order of the Bankruptcy Court.

## D.    IMPORTANT DISCLOSURES

THIS DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S PLAN OF REORGANIZATION, FILED BY THE DEBTOR, SUMMARIZES CERTAIN PROVISIONS OF THE DEBTOR'S PLAN OF REORGANIZATION (THE "PLAN"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST THE DEBTOR. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTOR AND CLAIMS ASSERTED AGAINST THE DEBTOR IN THE CHAPTER 11 CASE. WHILE THE DEBTOR BELIEVES THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE INFORMATION SUMMARIZED, CREDITORS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.

ONLY THOSE REPRESENTATIONS SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED BY THE DEBTOR. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

4

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER DATE IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. DEBTOR IS UNABLE TO GUARANTEE THAT THE INFORMATION CONTAINED IN THE PLAN AND THIS DISCLOSURE STATEMENT IS ENTIRELY WITHOUT ERROR, BUT ALL REASONABLE EFFORTS HAVE BEEN MADE TO ENSURE THAT ALL REPRESENTATIONS ARE AS ACCURATE AS POSSIBLE AS OF THE DATE OF ENTRY OF AN ORDER APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125.

THE SOURCE OF INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE DEBTOR OR ITS AGENTS AND EMPLOYEES AND HAS NOT BEEN SUBJECT TO AN AUDIT UNLESS OTHERWISE SPECIFICALLY NOTED.  THE STATEMENTS MADE HEREIN LIKEWISE HAVE NOT BEEN VERIFIED BY DEBTOR'S COUNSEL, ALTHOUGH AN ATTEMPT HAS BEEN MADE TO BE CONSERVATIVE AND REALISTIC.  NEITHER THE DEBTOR NOR ITS COUNSEL REPRESENT OR WARRANT THE ACCURACY OF DISCUSSIONS CONTAINED HEREIN REGARDING EVENTS.

AS STATED PREVIOUSLY, YOU ARE URGED TO REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN AND HOW THOSE TRANSACTIONS WILL AFFECT YOUR CLAIM AGAINST, OR INTEREST IN THE DEBTOR.

THE DEBTOR WILL, IF NECESSARY, SEEK CONFIRMATION UNDER THE CRAMDOWN PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF INTENT TO INVOKE THE CRAM DOWN PROVISIONS OF SECTION 1129(b).

A COPY OF THE PROPOSED PLAN IS INCLUDED IN THE MATERIALS YOU RECEIVED.  IF YOU DID NOT, FOR WHATEVER REASON, RECEIVE A COPY OF THE PLAN, OR YOUR COPY OF THE PLAN IS ILLEGIBLE, YOU MAY CONTACT COUNSEL FOR THE DEBTOR, ROBERT W. RALEY, 290 BENTON SPUR ROAD, BOSSIER CITY, LA 71111, IN WRITING OR VIA EMAIL TO bankruptcy@robertraleylaw.com.

VOTING DEADLINE: [**DEADLINE TO BE FIXED BY THE COURT AND INSERTED HERE**]

**ARTICLE II**
**DEFINITIONS**

In addition to terms defined elsewhere in this Disclosure Statement, terms which are used in this Disclosure Statement that are defined in Article I of the Plan, pages 1 through 11, shall have the meaning ascribed to them in the Plan. Article I Plan Definitions are incorporated into and are a part of the Disclosure Statement as if set forth in full herein. References to "Sections" in the incorporated definitions are to Sections of the Plan.


**ARTICLE III**
**DEBTOR'S BACKGROUND INFORMATION**


**A.     HISTORY OF THE DEBTOR**

The Debtor is in the business of providing consultant, management, and related services through employees and third parties, including, but not limited to drilling and completion foremen. drilling and completion foremen engineers, mud consultants, rig clerks, logistical coordinators, performance engineers, HSE advisors and consultants, SEMS advisors, rig commissioning managers, project managers, cement specialists, shore base dispatchers, material coordinators, other oil field consultants and construction workers to its clients.

RWDY, Inc., was formed in 2001 and grew from one Master Service Agreement to over six-hundred Master Service Agreements in early 2020.


**B.     EVENTS LEADING UP TO BANKRUPTCY**

In early March of 2020, overnight, the price of oil dropped from $48 BBL to $29 BBL. Operators began shutting down drilling rigs and completion sites. Oil prices continued to drop, and on April 20, 2020 for the first time in history, Oil prices went to **negative** $37 BBL. The rig count declined from roughly from 900 to less than 250 operating rigs resulting in a 90% manpower reduction in the drilling sector. All of this was exacerbated by COVID 19. The final straw occurred when, in management's opinion, fraudulent litigation was launched against RWDY Inc., which deployed draconian, pre-judgment seizure remedies that forced RWDY Inc., to seek relief under Chapter 11 of the Bankruptcy Code.

The Debtor filed RWDY's First Bankruptcy Case, No. 20-10616, on June 22, 2020, in the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division. On January 21, 2021, the Court confirmed Debtor's Plan of Reorganization [Docket No. 283], and an Order Granting Final Decree was entered on March 31, 2021. After successful reorganization, the Debtor emerged from bankruptcy and was well-positioned to take advantage of lucrative

6

opportunities in the oil industry recovery and to expand into the manufacturing sector. To the best of RWDY Management's knowledge, all aspects of the Debtor's business was performing excellently.

After confirmation of the First Bankruptcy Case plan of reorganization, Kenneth A. Lowery ("Lowery") increasing managed the operation of RWDY's business. Brian Owen ("Owen"), the former president and majority shareholder of RWDY, decreased his presence and participation in the business operations, and by early summer of 2022, Owen was absent much of the time. In December 2022, one of RWDY's larger customers refused to pay an invoice on the basis of an alleged Merchant Cash Advance Lender's assertion of UCC Article 9 account holder rights. RWDY management learned that Owen engaged in wholly unauthorized transactions with a group of Merchant Cash Advance Lenders ("MCA Lenders") which, if allowed to given effect, would misappropriate RWDY's future receivables and funds and violate the rights of RWDY's legitimate creditors and its accounts receivable financier, Seacoast Business Funding a Division of Seacoast National Bank. When RWDY management confirmed this, Owen resigned from RWDY and transferred his stock to the corporation , with the result that Lowery became the sole shareholder of RWDY.

The group of Merchant Cash Advance Lenders ("MCA Lenders") contend that they purchased millions of dollars of RWDY's future receivables for which the MCA Lenders have filed claims totaling $17,609,749.25. RWDY never authorized a single transaction with any of the MCA Lenders. In fact, the MCA Lenders appear to have advanced $9,000,000.00 to or in the name of Pusher LLC, $1,800,000.00 to or in the name of Multi-Well LLC, and $4,075,000.00 to Owen through an account that he had opened at Citizens Bank. Pusher LLC and Multi-Well LLC are both limited liability companies that are solely owned by Owen. RWDY did not authorize the opening of the account at Citizens Bank. Owen opened the account at Citizens Bank using his home address. RWDY had no access to the Citizens Bank account and received no funds from the Citizens Bank account. The Citizens Bank account was not on RWDY's general ledger. RWDY never received one-cent of money or any value whatsoever from the MCA Lenders.

As a result, RWDY Inc. had no alternative but to file for protection under the Bankruptcy Code.

## ARTICLE IV
## ASSETS AND LIABILITIES OF THE DEBTOR

**A.      OVERVIEW OF ASSETS AND LIABILITIES AT THE TIME OF FILING**

Attached hereto as Exhibit 1 is a Summary of the Debtor's Schedules reflecting the Debtor's estimation of its assets and liabilities as of the Petition Date. Also attached hereto as Exhibit 2 is a complete copy of the Debtor's Schedules, including Schedule A (Real Property),

Schedule B (Personal Property), Schedule D (Creditors Holding Secured Claims), Schedule E (Creditors Holding Unsecured Priority Claims), Schedule F (Creditors Holding Unsecured Nonpriority Claims) and Schedule G (Executory Contracts and Expired Leases); and a copy of Amendment to Schedules A, B, E and F filed in its Bankruptcy Case.

PLEASE NOTE THAT ANY REVIEW OF THE SCHEDULES ALONE WILL NOT PRESENT THE COMPLETE FINANCIAL PICTURE OF THE DEBTOR. THE SCHEDULES MUST BE REVIEWED ALONG WITH, INTER ALIA, THE CLAIMS REGISTER AND ANY ORDERS OF THE BANKRUPTCY COURT RELATING SPECIFICALLY TO CLAIMS IN THIS CHAPTER 11 CASE. YOU SHOULD NOT ONLY REVIEW THE SCHEDULES, BUT YOU SHOULD ALSO REVIEW THE INFORMATION SET FORTH HEREINAFTER THAT AFFECTS THE INFORMATION PRESENTED BY THE DEBTOR'S SCHEDULES.

**B.      DEBTOR'S ASSETS AT THE TIME OF THE FILING AND AFTERWARDS**

Included in Exhibit 1 is Debtor's statement of its assets as of the Petition Date. In addition, and only to the extent not previously included on Debtor's Schedules, the Debtor believes it has other assets, some of which constitute specific claims, Causes of Action or other litigation rights that arose upon the filing of the Chapter 11 Case. A more specific description of such Causes of Action is described and outlined in Part VI.F of this Disclosure Statement.

**C.      CLAIMS ASSERTED AGAINST THE DEBTOR**

The Claims scheduled in the Debtor's Schedules in this Chapter 11 Case exceed $5,000,000.00. The Analysis and Treatment of Claims Spreadsheet, Exhibit 4 to the Disclosure Statement, specifies the estimated number of claims in each Class, the Claim amounts and the proposed distributions. Claims filed against the Debtor may not necessarily have become Allowed Claims. The Debtor is in the process of analyzing these Claims and may file objections to one or more of such Claims. Pursuant to the proposed Plan, the Debtor has ninety (90) days after the Effective Date to file any objections to Claims. A copy of the Court's register for Claims filed against the Debtor (the "Claims Register") is attached hereto as Exhibit 3. The Claims Register may contain some Claims that have been paid, resolved in lower amounts, are duplicative, or are disputed by the Debtor. The Debtor reserves all rights to object to any and all Claims, liens and Interests filed or asserted against the Debtor or its property or property interest notwithstanding any discussions or treatment herein.

**ARTICLE V**

**SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**

**A.      FIRST DAY PLEADINGS AND HEARING**

Shortly after filing its voluntary petition, the Debtor filed six "first day" pleadings: (a) a motion seeking authority to use Seacoast Business Funding's cash collateral on a continuing basis and other related relief (subsequently supplemented and amended), (b) an application to employ attorneys, (c) an application to employ Accountant, (d) an application to retain services and set salaries of officers, directors, and other insider employees, (e) a motion to set bar date for filing proofs of claim, and (f) a Motion to Pay Critical Vendors and to approve inadvertent de minimis payments on prepetition claims. After conducting hearings on the first day motions, and in due time, the Bankruptcy Court granted the requested relief.

**B.      FILING OF ADVERSARY PROCEEDING COMPLAINT AGAINST BRIAN T. OWEN**

On February 7, 2023, the Debtor filed an adversary complaint in the United States Bankruptcy Court, Western District of Louisiana, Adversary Proceeding No. 23-01003, against Brian T. Owen. The complaint sought, *inter alia,* (i) the determination of property of the bankruptcy estate; (ii) the turnover of property of the estate; (iii) the determination of avoidance of, and/or recovery of fraudulent conveyances; (iv) matters concerning the administration of the estate; (v) proceedings affecting the assets of the estate; and (vi) other proceedings affecting the administration of the estate.

On April 12, 2023 the Court entered judgment in favor of plaintiff, RWDY, INC, and against defendant, Brian T. Owen, in the sum of $27,204,990.83. A copy of the Judgment is attached as Exhibit 10.  Unfortunately, the judgment is probably uncollectable.

**C.      FILING OF FIRST AND SECOND MOTION TO EXTEND THE EXCLUSIVITY PERIOD**

On April 12, 2023, Debtor filed its first motion to extend the exclusivity period, and, for good cause shown, on April 26, 2023 the Court entered an order extending the exclusivity period.

On July 18, 2023, Debtor filed its second motion to extend the exclusivity period, and, for good cause shown, on August 7, 2023 the Court entered an order extending the exclusivity period.

9

**D.  RULE 2004 DOCUMENT PRODUCTION, EXAMINATIONS, MOTIONS FOR PROTECTIVE ORDERS AND MOTION FOR ORDER OF CONTEMPT.**

Pursuant to the Local Court Rules, Debtor sought to require the production of documents and to examine the principals of the MCA Lenders. As of the date of the filing of the Disclosure Statement, the 2004 examinations and have been scheduled. However, the examination process has not been completed.

**E.  SCHEDULES, IDI AND 341 MEETING**

On January 4, 2023, the Debtor filed its Schedules of Assets And Liabilities and Statement of Financial Affairs.

On January 9, 2023, the United States Trustee convened the Initial Debtor Interview.  The Debtor, through its counsel and its representatives, appeared telephonically for the interview held at the office of the United States Trustee

On January 30, 2023, the United States Trustee convened the meeting of creditors held pursuant to Section 341 of the Bankruptcy Code, of which notice was provided to the Debtor's known creditors at that time.  The Debtor, through its counsel and its representatives, appeared telephonically for the meeting held at the office of the United States Trustee.

On February 15, 2023, the Debtor filed an Amended Schedule A/B and Statement of Financial Affairs. A copy of the filing is included in Exhibit 2. The schedules of assets and liabilities and statement of financial affairs do not indicate that the asset reflected on the Debtor's schedules as a note receivable from Owen in the amount of $23,738,598.63 has little, if any value. That asset now exists as part of a judgment in favor of RWDY against Owen in the amount of $27,204,990.83 rendered in Adversary Proceeding No. 23AP-1003 filed in connection with this case.

**F.  RETENTION OF PROFESSIONALS**

<u>Employment of Legal Counsel</u>:  On December 28, 2022, the Debtor filed an Application to Employ Legal Counsel, Robert W. Raley, Esq., 290 Benton Spur Road, Bossier City, LA 71111, and Ayers, Shelton, Williams, Benson & Paine, LLC, 333 Texas Street, Shreveport, LA 71101. The Bankruptcy Court entered an order approving the employment of Robert W. Raley, Esq., and *Ayers-Shelton* as counsel for the Debtor.

<u>Employment of Accountant</u>:  On December 28, 2022, the Debtor filed an Application to employ Trent Millican, Director of Postlethwaite & Netterville, APAC, as accountant for the

Debtor. The Bankruptcy Court entered an order approving the employment of Trent Millican, Director of Postlethwaite & Netterville, APAC as accountant for the Debtor.

### F.  POST-PETITION OPERATIONS OF DEBTOR

The Debtor's Monthly Operating Reports reflecting post-petition operations through September 31, 2023 are attached hereto as Exhibit 4 and incorporated by reference herein. Generally, the Debtor has collected [factored] invoices from its clients and has paid ordinary course operational expenses.

### G. POST-PETITION FINANCING

The Debtor entered into an agreement under which Seacoast Business Funding, a Division of Seacoast National Bank, continues to provide financing for the Debtor. The agreement was approved by a final order of the Bankruptcy Court, and a copy is attached as Exhibit 8. The Bankruptcy Court's order maintains the pre-petition agreements with Seacoast Business Funding in effect, along with the security interests, and liens of Seacoast Business Funding.

**ARTICLE VI**
**SUMMARY OF THE PLAN**

### A.    OVERVIEW OF THE PLAN

THE FOLLOWING DISCUSSION IS ONLY A GENERAL OVERVIEW OF THE PLAN.  IT IS NOT INTENDED TO MODIFY THE TERMS OF THE PLAN IN ANY WAY. THE PLAN IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY IN DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN.

The Plan provides for a reorganization of all liabilities owed by the Debtor, as described herein.

### B.    CLASSES AND DISTRIBUTIONS

The Plan separates Claims against the Debtor, the Estate and its property into Unclassified Claims and Classified Claims.

Unclassified Claims are generally post-petition Claims that must be paid in full and which do not vote on the Plan, and may consist of the following: (i) Allowed Administrative Claims; and (ii) Allowed Priority Claims.

Classified Claims and Interests are classified in the Plan pursuant to the provisions of Section 1122 of the Bankruptcy Code into the following classes:

Class 1:      Secured Claim of the United States Small Business Administration (Impaired)

Class 2:      The U.S. Small Business Administration PPP CARES ACT Claim (Impaired)

Class 3:      Secured Claim of Origin Bank (Impaired)

Class 4:      Secured Claim of Seacoast Business Funding (Impaired)

Class 5:      Merchant Cash Advance Lenders (Impaired)

Class 6:      RWDY Distribution Trust Beneficiaries (Impaired)

Class 7:      Cudd Energy Services' Prepetition Compromised Claim (Impaired)

Class 8:      General Unsecured Claims (Impaired)

Class 9:      Equity Interest Holders (Impaired)

Class 10:     Payments to the United States Trustee (impaired)


The Debtor has prepared an Analysis and Treatment of Claims that summarizes and demonstrates the classification and treatment of classified and unclassified Claims under the Plan. A copy is attached as Exhibit 5. In preparing and submitting Exhibit 5, the Debtor emphasizes and makes clear the following:

Exhibit 5 is an estimate only, based on reasonable assumptions or filed proofs of claim, but as an estimate it is subject to change and uncertainty based on future events. Any Claims listed on Exhibit 5 and/or below may be disputed and may or may not be Allowed in the amount filed or stated.

The Debtor reserves its right to object to any claim not allowed in the Plan, and it informs all Creditors that it may prosecute multiple claim objections to Claims that are not Finally Allowed under the Plan, including after the Effective Date, regardless of whether the affected Creditor accepts the Plan.

## C.    TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan classifies and treats various classes of Creditors of the Debtor's Estate.  The following is a summary of the classification and treatment of Creditors' Claims under the Plan. The Debtor reserves all rights to object to any and all Claims, Liens, and interests filed or asserted against the Debtor or its Property notwithstanding any listing of a Creditor's Claim or the amount or status thereof on the Debtor's schedules or statement of financial affairs, discussion or treatment herein or in the Plan.  The following is a summary only, and the Plan controls in all events.  Thus, close reference to the Plan is required to fully understand any Class's treatment under the Plan.

Administrative Claims:  Administrative Claims consist of any claim for payment of any cost or expense of administration of the Chapter 11 Bankruptcy Proceeding entitled to priority in accordance with Sections 503(b) and 507(b)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Debtor's Estate and operating its business from and after the Petition Date to and including the Confirmation Date (other than such Claims or portions thereof which, by their express terms, are not due or payable by the Distribution Date) and all allowances of compensation and reimbursement approved by the Court in accordance with the Bankruptcy Code and any fees or charges assessed against the Debtor's Estate under Chapter 11 of the Bankruptcy Code.

Administrative Claim Applications and Deadline:  Holders of Administrative Claims, including Professional Claims, other than: (a) Allowed Administrative Claims as of the Effective Date; (b) Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtor's business which may be paid in the ordinary course of the Debtor's business without order of the Bankruptcy Court; and (c) Administrative Claims that constitute fees or charges assessed against the Estate under Chapter 123, Title 28, United States Code, must by no later than the Administrative Claim Bar Date: (i) file an application with the Bankruptcy Court for allowance of the Administrative Claim; and (ii) serve a copy of such application on the Debtor, the United States Trustee and all other parties entitled to notice thereof. Failure to file and serve such application by the Administrative Claim Bar Date or Professional Claim Bar Date, whichever date is applicable, shall result in the Administrative Claim being forever barred and discharged. Except as specifically provided in the Plan, nothing in the Plan alters the law applicable to, and governing, the allowance of Administrative Claims (including Professional Claims) under the Bankruptcy Code and/or the Bankruptcy Rules.

Treatment of Administrative Claims:  To the extent that the Debtor and the Holder of an Administrative Claim may otherwise agree in writing, Administrative Claims which are Allowed Claims prior to the Effective Date of the Plan shall be paid in full in Cash on or before the Effective Date of the Plan. Administrative Claims that become Allowed Claims after the Effective Date of the Plan shall be paid in full in Cash on or before ten (10) business days following the date the Administrative Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court.

13

Treatment of Professional Claims:  Professional Claims become Allowed the same as Administrative Claims in Section 4.1 of the Plan, and are treated the same as Administrative Claims in Section 4.2 of the Plan, except that: (i) a Professional Claim that has been previously Allowed on a final (not interim) bases by Final Order of the Bankruptcy Court is not subject to the requirement of filing an application as provided in Section 4.1; (ii) a Professional Claim that has been Allowed on an interim basis (not final) in whole or in part, shall with respect to being Allowed on a final basis, be subject to the filing of an application for its allowance as provided for in Section 4.1, but shall be filed by the Professional Claims Bar Date (as opposed to the Administrative Claim Bar Date) and shall be subject to such law, rules and procedures as would be otherwise applicable to the same outside of the Plan; (iii) a Professional Claim that has been previously Allowed and paid on a final basis by Final Order of the Bankruptcy Court, but subject to disgorgement in the event of administrative insolvency, shall cease being subject to said disgorgement in the event of administrative insolvency, shall cease being subject to said disgorgement ten (10) days after the Professional Claims Bar Date unless, upon motion and notice, the Bankruptcy Court extends such period; (iv) any interim payments on account of a Professional Claim shall be credited against the payment of the final Allowed amount of such Professional Claim; and (v) any retainer provided on account of a Professional Claim may be credited and applied against the payment of the final Allowed amount of such Professional Claim once such Professional Claim is Allowed on a final basis.

Post-Confirmation Fees and Expenses:  Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action (including, without limitation, the need to file a fee application), order or approval of the Bankruptcy Court.

Priority Tax Claims:     Priority Tax Claims shall be paid by the Reorganized Debtor, up to the Allowed amount of such Claim, plus interest at the rate of 3.5% per annum accrued thereon on a quarterly basis on January 1, April 1, July 1 and October 1,  of each year over a period not exceeding five (5) years after the date of the order for relief, as provided in § 1129(a)(9)(C) of the Bankruptcy Code, commencing after the first full quarter following the Effective Date.  If the Reorganized Debtor fails to make a payment owed on an Allowed Priority Tax Claim pursuant to the terms of the Plan, it shall be deemed an Event of Default.  In the event that an event of default occurs with regard to an Allowed Priority Tax Claim, the specific Holder of the Priority Tax Claim shall send a written notification, via first class mail, postage pre-paid, to the Reorganized Debtor of the event of default. The Reorganized Debtor shall have thirty (30) days from the date the written notification is sent to cure the event of default in full or the Holder of the Allowed Priority Tax Claim may: (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek such relief as may be appropriate in the Bankruptcy Court.  The Reorganized Debtor's mailing address for purposes of sending this written notification is 2640 Youree Drive, Suite 200, Shreveport, LA 71104. Notices sent to the

Reorganized Debtor by the Holder of an Allowed Priority Tax Claim shall be sent by first class mail, postage pre-paid.

Payments to the United States Trustee: The Reorganized Debtor shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. 1930(a)(6). Any fees due as of the date of the Confirmation Hearing will be paid in full on the Effective Date of the Plan. After confirmation, the Reorganized Debtor shall pay United States quarterly fees as they accrue until this case is closed by the Bankruptcy Court. The Reorganized Debtor shall file with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.

Insured Claims: Insured Claims shall be satisfied from the proceeds of any applicable Insurance Policy. Insured Claims include the Claims held by (i) Apache, (ii) H&P, (iii) Matthew Dove, (iv) Mario Sanchez, (v) Johnny Aldana and Leonard Aldana, (vi) Rocky Gaspard, (vii) Carlos Franco, (viii) Trotter, (ix) Tanner Snider, (x) Manuel and Dora Gonzalez. Insured Claims are not classified and are not entitled to any distributions under the Plan; however, the relevant holder shall exhaust all remedies with respect to the applicable Insurance Policy. Any Insured Claim shall be deemed to be satisfied in full from the proceeds of the applicable Insurance Policy. Nothing in this paragraph shall constitute a waiver of any claim, right or cause of action the Debtor or the Estate may hold against any Person, including any insurer. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which any Debtor is an insured or beneficiary or for purposes of any insurance recovery.

Inapplicability to Seacoast: Prior to the Effective Date of the Plan approval by the Court and payment of any fees and costs, including attorney's fees incurred by Seacoast under the Post-Petition Agreements, and to the extent such fees and expenses may qualify as Professional Claims, this section is inapplicable, and instead the payment of any such fees and expenses incurred by Seacoast for which Seacoast is entitled to reimbursement by the Debtor under the Post-Petition Agreements, shall be governed exclusively by the procedures established under the Final Financing Order and the Post-Petition Agreements.

## D.  TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN

The following is a summary of the treatment of the various classified claims under the Plan. It is important to note that the Plan provides the specific terms of the treatment, and that the Plan is the operative document that must be consulted for an exact understanding and explanation of the Plan's effect on classified Claims. Furthermore, although the alleged liens and security interest of classified Creditors are described below, that description is not to be considered an agreement that any lien or security interest is valid, enforceable, perfected, and not avoidable by the Debtor, and this Disclosure Statement is without prejudice to those issues.

The Debtor reserves the right to contest the validity, extent, priority, perfection and avoidance of any alleged lien or security interest except where (i) a previous order of the Bankruptcy Court has been entered relating to the validity, enforceability, perfection and avoidance of a lien or security interest; or (ii) the Plan provides for the validity, extent, priority, perfection and non-avoidance thereof, including by allowing a fully secured claim or by releasing any potential lien or security interest holder.

**D.1**    **Secured Claim of the United States Small Business Administration (Class 1)**:

**D.1.1**  Class 1 shall consist of the Allowed Secured Claim of the United States Small Business Administration.

**D.1.2**  The United States Small Business Administration holds a secured claim in the allowed amount of $150,000.00. It will be paid in 320 monthly installment payments of $701.45 that includes interest at the rate of 3.25% per annum. The accrual of interest and the payments will commence on the on the 15th Day of the first month following the Plan's Effective Date.

**D.1.3**  Retention of Liens: The United States Small Business Administration shall hereby retain the lien it currently holds, and its lien shall remain in full force and effect until all payments required under the Plan have been paid in full.

**D.1.4**  Impairment: The Class 1 Secured Claim of the United States Small Business Administration is Impaired under the Plan.

**D.2**    **The U.S. Small Business Administration PPP CARES ACT Claim (Class 2)**:

**D.2.1**  Class 2 consists of the U.S. Small Business Administration PPP CARES ACT Claim in the post-forgiveness amount of $34,872.00.

**D.2.2**  The Reorganized Debtor fully complied with the requirements for loan forgiveness pursuant to the Paycheck Protection Program under the CARES Act. As a result, the remaining post-forgiveness balance on the claim is $34,872.00. The claim will be paid in 60 monthly installment payments of $630.49 which includes interest at the rate of 3.25% per annum. The accrual of interest and the payments will commence on the on the 15th Day of the first month following the Plan's Effective Date.

**D.2.3**  The Class 2 Claim is impaired under the Plan.

**D.3**  **Secured Claim of Origin Bank (Class 3)**:

**D.3.1**  Class 3 shall consist of the Allowed Secured Claim of Origin Bank related to Origin Bank credit card charges secured by a RWDY deposit account.

**D.3.2**  Origin Bank holds a Secured Claim in the allowed amount of $108.73. It will be paid in full on the on the 15th Day of the first month following the Plan's Effective Date.

**D.3.3**  Retention of Liens: Origin Bank will retain the lien it currently holds, and its lien will remain in full force and effect until all payments to Origin Bank required under the Plan have been paid in full.

**D.3.4**  Impairment:  The Class 3 Secured Claim of Origin Bank is Impaired under the Plan.

**D.4**  **Secured Claim of Seacoast Business Funding (Class 4):**

**D.4.1**  Class 4 shall consist of the Allowed Fully Secured Claim of Seacoast Business Funding, a Division of Seacoast National Bank ("Seacoast"). Seacoast holds a fully secured claim in the Petition Date amount of $18,617,531.50. The Seacoast Claim will be paid/treated in accordance with the Post-Petition Agreements in accordance with the following.

**D.4.2**  The Debtor and Seacoast operated prepetition pursuant to a Purchase Agreement entered into on or about November 21, 2018 as amended, supplemented and/or restated by that First Amendment to Purchase Agreement dated March 26, 2019, that Second Amendment to Purchase Agreement dated May 9, 2019, that Third Amendment to Purchase Agreement dated October 26, 2019, that Fourth Amendment to Purchase Agreement dated October 13, 2020, and that Fifth Amendment to Purchase Agreement dated September 1, 2022 (hereinafter collectively, the "Purchase Agreement"), and in addition, post-petition, have operated and continue to operate pursuant to the Purchase Agreement, as amended and/or supplemented by that Post-Petition Chapter 11 Bankruptcy Rider to Purchase Agreement (the "Bankruptcy Rider") (the Purchase Agreement and the Bankruptcy Rider shall hereinafter be referred to collectively as, the "Post-Petition Agreements"), as approved by the Bankruptcy Court pursuant to the entry of the Final Financing Order. Pursuant to the Final Financing Order, Seacoast has a first priority duly perfected ownership interest in all Accounts that Seacoast purchases from the Debtor, post-petition, and Seacoast was granted a first priority perfected security interest and liens in all assets of the Debtor, including, but not limited to, all Accounts, including non-Purchased Accounts, which security interest secures any now existing and hereafter arising Post-Petition Obligations (as defined in the Final Financing Order) owing by the Debtor arising from the post-petition purchase advances made to the Debtor by Seacoast in order to purchase Purchased Accounts in accordance with the Post-Petition Agreements.

**D.4.3**  Pursuant to the Post-Petition Agreements, all prepetition and post-petition Obligations (as defined in the Final Financing Order) due to Seacoast must be repaid in full, without setoff, recoupment or deduction, "by no later than…the effective date of any confirmed Plan, unless Seacoast agrees to and consents, in writing, to other treatment under a Plan." Pursuant to the Post-Petition Agreements, the Debtor's failure to satisfy all monetary obligations

17

owing to Seacoast by the effective date of the Plan constitutes an Event of Default under the Post-Petition Agreements.

**D.4.4** The Debtor has notified Seacoast that since the Debtor does not anticipate having sufficient liquidity to pay, in full, all Obligations owing to Seacoast it will be unable to repay the Post-Petition Obligations in full at confirmation. In order to induce Seacoast to consent to a Plan, the Debtor has agreed to preserve for the benefit of Seacoast, and to grant to Seacoast, each of the following rights post-confirmation under the Post-Petition Agreements, the Final Financing Order, and the following terms:

(i) All existing and hereafter arising rights and interests granted to Seacoast, and all monetary and non-monetary obligations owed and hereafter owing to Seacoast by the Debtor and the Reorganized Debtor, under and in respect to the Post-Petition Agreements, and the Final Financing Order shall be and are hereby ratified and acknowledged, and approved without any modification or further Court approval, and the Post-Petition Agreements, and the Final Financing Order shall at all times be fully preserved, and shall remain in full force and effect post-confirmation and fully binding on the Debtor and the Reorganized Debtor and all parties-in-interest of the Debtor and the Reorganized Debtor.

(ii) The Debtor and the Reorganized Debtor, except for any monetary obligations altered by the Plan, expressly assume, upon entry of a Confirmation Order, all of the terms, duties and obligations under the Post-Petition Agreements and the Final Financing Order, which shall be binding on and govern the factoring relationship between Seacoast and the Reorganized Debtor on and as of the Confirmation Date, except that Seacoast shall have no duty to comply with any terms contained in the Final Financing Order that no longer apply on or as of the Confirmation date, including, but not limited to, the procedures contained in Sections 13 (establishing procedures for reimbursement of Seacoast's attorney's fees and costs), and 19 (solely as is relates to any requirement that Seacoast seek stay relief prior to exercising its default rights after an Event of Default under the Post-Petition Agreements and/or the Final Financing Order) of the Final Financing Order.

(iii) Nothing contained in any Plan (or any amended Plan) or any Confirmation Order approving a Plan (or any amended Plan), shall adversely effect, modify, enjoin, impair, interfere with, or negatively impact: (a) any of Seacoast's rights and/or the Debtor's and the Reorganized Debtor's now existing and hereafter arising monetary obligations and non-monetary obligations owing to Seacoast, under and with respect to the Post-Petition Agreements, and the Final Financing Order, and the terms of this Plan, including, without limitation, Seacoast's first priority ownership interest in all Purchased Accounts (as defined by the Post-Petition Agreements) and Seacoast's duly perfected first priority security interest, liens and interests recognized or granted to Seacoast in the prepetition Collateral and post-petition Collateral (as defined in the Post-Petition Agreements and the Final Financing Order), including, but not limited to, any non-Purchased Accounts, general intangibles and all proceeds thereof, and the Reserve, which are fully preserved and which Collateral shall continue to secure post-confirmation any now existing

18

and hereafter arising advances, over-advances, fees and/or financial accommodations made to, and due from the Debtor and the Reorganized Debtor, and/or (b) any rights that Seacoast has or may hereafter have in respect to any supporting obligations (as such term is defined in the Uniform Commercial Code), including any guarantor of the Obligations under the Post-Petition Agreements , and (c) any obligations and/or restrictions imposed on any person, including, any prepetition lender(s) and/or any other party, including, but not limited to, any MCA Lender of the Debtor that prevents such parties from taking any action that violates Seacoast's rights as provided in section 10 in the Final Financing Order or otherwise, and such restrictions shall remain in effect and shall continue post-confirmation, including, but not limited to, Seacoast's exclusive rights to collect and retain payment of all Purchased Accounts and non-Purchased Accounts, nor shall any person be entitled to otherwise notify, whether pursuant to 9-406 of the Uniform Commercial Code or otherwise, any Account Debtor or payor to remit payment due on any Accounts to any person except Seacoast.

(iv) In the event the Debtor and/or the Reorganized Debtor defaults under the Post-Petition Agreements and/or the Plan, Seacoast shall be entitled to exercise and enforce all rights and remedies, under the and in respect to the Post-Petition Agreements, the Plan and applicable state law, free of any automatic stay under 11 U.S.C. § 362 or any injunction under 11 U.S.C. § 524(a), or otherwise.

(v) In the event of a breach of the Plan, and/or the Post-Petition Agreements, the Bankruptcy Court will retain non-exclusive, concurrent jurisdiction together with any state or federal court having subject matter and in personam jurisdiction over the subject matter and the parties as provided in the Post-Petition Agreements, to enforce to the terms of the Plan (or any amended Plan), and/or the Post-Petition Agreements between Seacoast and the Debtor, including the Reorganized Debtor, and the Debtor and the Reorganized Debtor each waive any right to contest the jurisdiction of any such state or federal court. In the event of any conflict or inconsistency between this section and any section in the Plan, including, Article XI below (Retention of Jurisdiction), this section shall control.

(vi) Notwithstanding anything to the contrary, in the event of an express conflict between the terms of the Final Financing Order on the one hand, and any Plan, including the Plan, including the Plan Supplement, the Confirmation Order, or any authorizing amendment or modification to the Plan, on the other hand, the Final Financing Order will control and as may be required by law, is incorporated into this Plan by reference. The Debtor's further acknowledges that Section 13.7 of the Plan (discharge of claims), Section 13.8 (discharge of debtor), Section 13.10 (injunctive relief), Section 8.4 (insofar as the right to object to claims) and Section 6.5 (revesting of assets to the Reorganized Debtor free and clear of liens, claims, etc.), are inapplicable to Seacoast.

(vii) After the Confirmation Date or Effective Date, whichever is earliest, the Debtor and Seacoast shall be entitled to modify the terms of the Post-Petition Agreements without having to obtain authorization from the Bankruptcy Court or a modification of this Plan, provided,

however, that Seacoast and the Reorganized Debtor shall provide notice to the Distribution Trustee of any modification, if any, that would affect any rights of the RWDY Distribution Trust.

(viii) The Debtor acknowledges and agrees that the existence and operation of the RWDY Distribution Trust as provided under First Bankruptcy Case Plan and any of the rights and powers granted, transferred, delegated, or otherwise, to any person under the RWDY Distribution Trust, including, but not limited to, the Distribution Trustee and any beneficiary of the Trust, shall not adversely effect, modify, enjoin, impair, interfere with, or negatively impact any of Seacoast's rights and/or the Debtor's (and the Reorganized Debtor's) monetary and non-monetary obligations to Seacoast under and with respect to the Post-Petition Agreements and the Final Financing Order except as provided herein. The Distribution Trustee is neither a party to the Post-Petition Agreements, nor an intended third-party beneficiary, and the Distribution Trustee has no rights or standing under or with respect to the Post-Petition Agreements.

(ix) Upon notice by Seacoast to the Reorganized Debtor and the Distribution Trustee of the occurrence of any event which would be an Event of Default under the Post-Petition Agreements: (a) the Debtor's and the Reorganized Debtor's right to use any portion of any purchase price advances received from Seacoast or any other sources of funds for the purpose of funding any Monthly Distribution Amounts to the RWDY Distribution Trust shall terminate, and (b) the Distribution Trustee shall not accept any further Monthly Distribution Amount from the Reorganized Debtor, unless and until such Event of Default is cured and, Seacoast issues a Notice withdrawing such notice of default ("Withdrawal Notice"). Notice of default, shall be validly given, made, or served, if in writing and sent by registered or certified mail, or by commercial courier or by registered email (e.g., rpost) to the address listed in section 13.11 of the Plan, below. If Seacoast, in its sole and absolute discretion, issues a Withdrawal Notice, the Reorganized Debtor shall re-commencing paying The Distribution Trustee the next Monthly Distribution Amount owing prior to a notice of default, payable the first day of the next calendar month following such Withdraw Notice, until such time as any subsequent notice of default notice is issued by Seacoast under this section.

(x) All Monthly Distribution Amounts which the Distribution Trustee receives prior to Seacoast's giving notice of an Event of Default as set forth in the preceding subparagraph (ix) shall be received by the Distribution Trustee free and clear of any claim or lien of Seacoast, and the Distribution Trustee may therefore retain, make disbursements from, or otherwise use such Monthly Distribution Amounts received by the Distribution Trustee prior to Seacoast's giving notice of an Event of Default to the Distribution Trustee as set forth in the preceding subparagraph (ix) pursuant to the terms of the RWDY Distribution Trust.

(xi) Should the Reorganized Debtor, or settlor, remit any Monthly Distribution Amount to the Distribution Trustee after Seacoast has given notice of an Event of Default as set forth in the preceding subparagraph (ix), the Distribution Trustee shall, as trustee to Seacoast, segregate and retain such funds, in trust, for the sole benefit of Seacoast, as beneficiary, shall not comingle any Monthly Distribution Amount with any other funds of the RWDY Distribution Trust, which shall

at all times be subject to the security interest and lien of, Seacoast, and upon request by Seacoast, the Distribution Trustee will turnover such funds to Seacoast.

(xii) In any and all events, the Distribution Trustee shall have no liability for funds disbursed in contravention of the preceding subparagraph (xi) unless and until a notice of an Event of Default and of Seacoast's intent to trigger the provisions stated in Plan Section 5.2.3.(IX) is received by the Distribution Trustee. The Distribution Trustee's Notice Address is set forth in section 13.12.

(xiv) In light of the foregoing, upon Confirmation of the Plan, the Reorganized Debtor and Seacoast shall be entitled to continue to conduct business pursuant to the terms of the Post-Petition Agreements; specifically, the Reorganized Debtor shall continue to be authorized to offer for sale to Seacoast Accounts and upon purchase by Seacoast such Accounts shall constitute Purchased Accounts, in exchange for which Seacoast will remit purchase price advances in accordance with and subject to the terms of the Post-Petition Agreements.

**D.4.5**  The Class 4 Claim of Seacoast Business Funding is Impaired under the Plan.

**D.5**  **RWDY Distribution Trust Claimants (Class 5):**

**D.5.1**  The Class 5 Claimants are those persons that are beneficiaries of the RWDY Distribution Trust and the beneficiaries' claims are not secured by property of this bankruptcy estate.

| THE CLASS 5 RWDY DISTRIBUTION TRUST CLAIMANTS | CLAIM AMOUNT BALANCE |
|---|---|
| EIN Cap, Inc. | $539,940.52 |
| Fox Capital Group, Inc. | $55,806.52 |
| Mr. Advance, LLC | $71,691.87 |
| Queen Funding, LLC | $259,308.28 |
| Tailored Fund Cap LLC | $1,830,936.55 |
| Tiger Capital Group LLC | $2,818,807.90 |
| Vernon Capital Group LLC | $1,775,395.15 |
| Jason Brazzel | $4,221.326.83 |
| AXA Equitable | $2,134.27 |
| BDO | $329,730.80 |
| BCBS | $14,334.78 |
| Maureen Jennings | $5,133.79 |
| McDermott, Will & Emery | $22,434.70 |
| Everest Premier Ins Company | $284,480.23 |
| AMEX | $1,288.74 |
| Louisiana Department of Revenue | $127.51 |

22-11308 - #266  File 10/17/23  Enter 10/17/23 20:03:53  Main Document    Pg 25 of 50

| | |
|---|---|
| Internal Revenue Service | $12,295.35 |
| New Mexico Taxation and Revenue | $3.14 |
| **TOTAL** | **$12,245,176.94** |

Certain of the Class 5 Claimants, who are beneficiaries of the RWDY Distribution Trust, have filed a proof of claim separate from the proof of claim filed by the RWDY Distribution Trustee. Those Claims and the Class 5 Claimants are as follows:

| | | |
|---|---|---|
| Claim 1: | NM Taxation and Revenue Department | $ 29,727.50 |
| Claim 2: | American Express National Bank | $ 768.58 |
| Claim 3: | American Express National Bank | $ 644.26 |
| Claim 5-3 | Internal Revenue Service | $ 908,061.92 |
| Claim 7-1 | Tailored Fund Cap, LLC | $5,709,518.99 |
| Claim 13 | Everest Indemnity Insurance Company | $ 290,873.88 |

The claims set forth in the above table, titled "THE CLASS 5 RWDY DISTRIBUTION TRUST CLAIMANTS," and the amounts set forth in that table include and are comprehensive of Claims 2, 3, 7-1, and 13. Claims 2, 3, 7-1, and 13 shall be Finally Allowed and paid in the amounts set forth in the aforesaid table as Class 5 Claims the RWDY Distribution Trust, and Claims 2, 3, 7-1, and 13 shall not be Allowed under as Claims any other Class. Claims 1 and 5-3 as filed may include all or part of the amounts set forth in the aforesaid table, and, if and to the extent that all or part of the amounts set forth in the aforesaid table are included in Claims 1 and 5-3, then that part of those claims shall be paid as Class 5 Claims.

**D.5.2**   On June 22, 2020, RWDY, Inc. ("RWDY") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division (the "Bankruptcy Court"), which was assigned case number 20-10616 (the "First Bankruptcy Case"). The Bankruptcy Court, through its January 21, 2021 order (the "Confirmation Order"), confirmed RWDY's chapter 11 plan of reorganization (the "Plan"). [1] In accordance with § 6.6 of the Plan, RWDY executed the Distribution Trust Agreement (the "Trust Agreement") which formed the RWDY Distribution Trust, of which, Lucy G. Sikes would serve as Distribution Trustee.

**D.5.3**   The First Bankruptcy Case Plan required RWDY to remit to the RWDY Distribution Trust the Monthly Distribution Amounts,[2] i.e., a sum "sufficient to enable the Distribution Trustee to make each of the monthly distributions required under the terms of the Plan, the Confirmation Order and the Trust Agreement as they come due."[3] Specifically, under § 9.4 of the **First Bankruptcy Case Plan**, RWDY is "required to make the Monthly Distribution Amounts on or before the 5th day of the first full calendar month after the Effective Date, and prior to the 5th

---

[1] Case No. 20-10616, Doc. No. 283.
[2] Case No. 20-10616, Doc. No. 283, § 9.11.
[3] Case No. 20-10616, Doc. No. 283, § 2.2 (alteration to original).

day of each calendar month thereafter, until all Allowed Claims have been paid in full under the terms of the Plan."[4] The Allowed Claims in Classes 4, 5, and 8 of the First Bankruptcy Case are entitled to 5.25% interest under the Plan.[5] In turn, the First Bankruptcy Case Plan required the Distribution Trustee to "distribute to Beneficiaries,[6] in accordance with the provisions of Article V of the First Bankruptcy Case Plan that portion of the Monthly Distribution Amount received (save and except the 2.5% additional portion of such Monthly Distribution Amount) to Beneficiaries."[7] In the First Bankruptcy Case Plan the aggregate Monthly Distribution Amount to be transferred by the Reorganized Debtor to the RWDY Distribution Trust on a monthly basis which amount shall be equal to the amount required to pay trust beneficiaries' Claims, formerly $182,228.16.

**D.5.4** RWDY shall commence paying an adjusted Monthly Distribution Amount of $136,852.60 on or before the 5th day of the first full calendar month after the Effective Date in this Chapter 11 Case, and prior to the 5th day of each calendar month thereafter, until all Allowed Claims have been paid in full under the distributions required under the terms of the First Bankruptcy Case Plan, Confirmation Order and the Trust Agreement, as supplemented and amended herein. Neither the interest rate nor the $136,852.60 adjusted Monthly Distribution Amount payment shall be modified; instead, the term shall be sufficiently extended to fully pay the Trust Beneficiaries' Allowed Claims.

**D.5.5** The confirmation of this Plan will amend the provisions of the RWDY Distribution Trust Agreement to the extent necessary to implement the provisions herein.

**D.5.6** As of December 31, 2022, the principal amount due to the Distribution Trustee is $12,245,176.94, plus interest at the rate of 5.25%.

**D.5.7** Nothing herein is or shall be deemed to be a waiver by the Distribution Trustee of any rights the Distribution Trustee has against RWDY, Owen (as guarantor under the Plan),[8] or any third party.

**D.5.8** Debtor's Plan of Reorganization Dated October 17, 2023 includes the following provisions in the designated plan sections that are relevant to the RWDY Distribution Trust:

Plan Section 1.2: Payments to Creditors;

---

[4] Case No. 20-10616, Doc. No. 283, § 9.4.

[5] Case No. 20-10616, Doc. No. 283, §§ 5.4.3, 5.5.2, 5.8.1.

[6] Case No. 20-10616, Doc. No. 283, § 2.2 (defining "Beneficiaries" as "in the context of the RWDY Distribution Trust shall mean those persons holding beneficial interests in the RWDY Distribution Trust, including but not limited to Allowed Claims in any of Classes 4, 5, and 8, herein.").

[7] Case No. 20-10616, Doc. No. 283, § 9.11 (alteration to original).

[8] Pursuant to § 6.13 of the Plan, Brian Owen agreed to execute a guarantee to "guarantee the payment of the obligations of the Reorganized Debtor to the RWDY Distribution Trust[.]" Case No. 20-10616, Doc. No. 283. In turn, Brian Owen and the RWDY Distribution Trust executed a Commercial Guaranty Agreement.

23

<u>Plan Section 2.2</u>: Definitions: Beneficiaries, Default, Distribution Trustee, Distributions under the Plan, Litigation, Monthly Distribution Amount, Rowdy Distribution Trust, and Settled Actions;
<u>Plan Section 3.3</u>: Classified Claims and Interests;
<u>Plan Section 5.5</u>: RWDY Distribution Trust Claimants (Class V);
<u>Plan Section 6.1</u>: Continued Operations of RWDY;
<u>Plan Section 8.5</u>: Creditors' Response to Objections;
<u>Plan Section 13.7</u>:Discharge of Claims; and
<u>Plan Section 13.10</u>: Injunctive Relief

A copy of the RWDY Distribution Trust Agreement is attached hereto as EXHIBIT 10.

*THE RWDY DISTRIBUTION TRUST WAS FORMED ON CONFIRMATION OF RWDY'S FIRST BANKRUPTCY CASE PLAN OF REORGANIZATION, AND ALL PROVISIONS OF THE THAT CONFIRMATION ORDER, PLAN SUPPLEMENT AND THE RWDY DISTRIBUTION TRUST AGREEMENT ARE INCORPORATED HEREIN AND CAN AFFECT YOUR RIGHTS. CLAIMANTS ARE URGED TO READ THE RWDY DISTRIBUTION TRUST AGREEMENT IN ITS ENTIRETY IN DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN. IN THIS BANKRUPTCY CASE, THE RWDY DISTRIBUTION TRUST BENEFICARIES'S CLAIMS ARE LIMITED TO THE RIGHTS ACCORDED TO THEM AS BENEFICARIES UNDER THE TRUST AS MODIFIED HEREIN.*

**D.5.9** The Class 5 Claims are impaired under the Plan.

**D.6** **<u>The Merchant Cash Advance Lender Claims (Class 6)</u>**:

**D.6.1** Class 6 shall consist of Merchant Cash Advance Lender Claims.

**D.6.2** All Class 6 Claims are disputed, unliquidated and contingent claims that were filed as secured claims. The controversy between the MCA Lenders and the Debtor includes, but is not limited to, whether Debtor is an obligated party under the Merchant Cash Advance Agreements; whether the MCA Agreements' transactions should be classified as loans or transfers; whether the transactions are subject to usury sanctions; the amount of all disbursements related to the MCA Agreements, the identity of the recipients of such disbursements and whether and why the Debtor would be liable for any such disbursements; the proper application of payment credits including refinance transactions; whether all or some of the prepetition payments and claimed interests are subject to avoidance as preferential transfers pursuant to 11 U.S.C. § 547 and/or avoidance as fraudulent transfers pursuant to 11 U.S.C. § 548 because they were made without adequate consideration; whether any of the MCA Lenders have a perfected security interest in any property of the estate under state law and/or under 11 U.S.C. § 506(a); whether any of the MCA Lenders perfected the transfer of an ownership interest in any of the accounts claimed to have been purchased by the MCA Lenders; whether the MCA claims are outranked by other claims having a higher priority; whether one or more of the MCA Lenders has violated 18 U.S.C. § 152(4); whether one or more of the MCA Lenders have civil liability to the Debtor on account

of the claim(s) filed by such MCA Lender; whether one or more of the MCA Lenders has violated 18 U.S.C. § 1962; and whether the MCA claims should be subordinated to other claims.

**D.6.3**   In this case, the Court has entered conclusions of law [1] that pursuant to Article 9 a buyer of accounts, identical to a secured party, is subject to the Article 9 rules that govern attachment, perfection and priorities of security interests in collateral. As a result, any dispute between a buyer and either another buyer of accounts, secured parties under Article 9, a trustee or a debtor-in-possession, requires that a buyer of accounts establish the validity, extent and priority of the buyer's interest in accounts which requirements are attachment, perfection and priority.

**D.6.4**   The Merchant Cash Advance Lenders filed secured claims in the following amounts:

| MCA Claimant Name | Claim No. | Date Filed | Claim Amount |
|---|---|---|---|
| Cannon Advance LLC d.b.a. Premier Funds US | 12 | 29-Mar-23 | $ 3,700,424.00 |
| GOAT Advance, LLC | 14 | 31-Mar-23 | $ 2,182,000.00 |
| Spin Capital LLC | 15 | 31-Mar-23 | $ 4,334,419.00 |
| Reliance Financial | 16 | 31-Mar-23 | $ 4,510,750.00 |
| MYNT Advance | 17 | 31-Mar-23 | $ 1,742,750.00 |
| Reserve Capital Management | 18 | 31-Mar-23 | $   327,906.25 |
| Slate Advance | 19 | 31-Mar-23 | $   811,500.00 |

**Note:** Cannon Advance Claim No. 8 and No. 9 are duplicate claims subsumed by Claim 12. Pursuant to 11 U.S.C. 502 and Fed. R. Bankr. P. 2008, Debtor has filed or will file an Objection to Claim No. 8 and No. 9.

**D.6.5**   The Debtor did not receive funds or anything else of value in connection with the MCA Lenders' filed claims. No MCA Lender [as a purported buyer of Debtors' receivables] perfected the transfer/purchase of any of Debtors' accounts pursuant to Article 9 rules. No MCA Lender, except Spin Capital LLC and Canon Advance LLC, filed a UCC Financing Statement to perfect a security interest in any of Debtors' accounts or other property.  Spin Capital LLC's and Canon Advance LLC's UCC Financing Statements were filed within the 11 U.S.C § 547 preference period under circumstance that meet the requirements for relief under that provision. Therefore, the MCA Lenders' claims are valued at zero for the purpose of distribution and voting.

**D.6.6**   To reiterate, Class 6, the Merchant Cash Advance Lenders, hold claims that are disputed, unliquidated and contingent. The Debtor has filed or will file objections and/or adversary proceedings to object to the Merchant Cash Advance Lender claims and to determine the extent, priority and validity of the liens.

---

[1] See order entered in this case on February 6, 2023, Doc. No. 87

**D.6.7**  If, in the alternative, (i) the Court finds that any of the Merchant Cash Advance Lenders holds an Allowed Secured Claim, such lender will retain its liens and shall receive payment of its Allowed Secured Claim, including a Market Rate of Interest which shall be the Wall Street Journal Prime Rate + 1.5% on a floating basis. If, in the alternative, (ii) the Court finds that any of the Merchant Cash Advance Lenders hold an Allowed Unsecured Claim, such lender shall receive payment of its Allowed Unsecured Claim with interest at the rate of 3.5%. If the Court entirely disallows the claim of any Merchant Cash Advance Lender, such lender will receive no distribution under the Plan and its liens and claims shall be extinguished.

**D.6.8**  If the Court allows the claim of any MCA Lender, each such claim holder will receive a Pro Rata share of the MCA Lender Monthly Distribution, not to exceed the monthly amount of $10,000.00, until all allowed Class 3 Claims are paid in full. The maximum monthly payment amount shall not be modified; instead, the payout term will be sufficiently extended to fully pay allowed Class 6 Claims.

**D.6.9**  The claims of the Class 6 Merchant Cash Advance Lenders are impaired under the Plan.

**D.7**  **Cudd Energy Services' Prepetition Compromised Claim (Class 7)**:

**D.7.1**  Class 7 shall consist of the Allowed Unsecured Litigation Claim held by Cudd Energy Services arising from a prepetition "Compromise Settlement Agreement and Mutual General Release". Under the agreement, the Debtor is to pay Cudd Energy Services $100,000.00 for a full release of all claims against the RWDY.

**D.7.2**  The Settlement Claim in the allowed amount of $100,000.00 will be paid in 60 monthly installment payments of $1,898.60 that include interest at the rate of 5.25% per annum. The accrual of interest and the payments will commence on the on the 15th Day of the first month following the Plan's Effective Date.

**D.7.3**  The Class 7 Unsecured Settlement Claim held by Cudd Energy Services is Impaired under the Plan.

**D.8**  **General Unsecured Claims (Class 8)**:

**D.8.1**  Class 8 shall consist of all other Allowed Unsecured Claims against the Debtor not placed in any other class, and, without limiting the foregoing, shall not include any Unsecured Claims of MCA Lenders or any unsecured Claims of RWDY Distribution Trust Beneficiaries. Creditors holding Allowed Class 8 General Unsecured Claims shall be paid 100% of their Allowed Class 8 Claims.

**D.8.2**  Each holder of an Allowed Class 8 Claim shall be paid in full on or before the 5th day of the first full calendar month after the Effective Date in this Chapter 11 Case.

26

**D.8.3**   The Class 8 General Unsecured Claims are Impaired under the Plan.

**D.9**     **Equity Interest Holders (Class 9)**:

**D.9.1**   Class 9 shall consist of the sole Equity Interest Holder, Kenneth A. Lowery, who holds 100% of the issued and outstanding stock in Debtor. The Class 9 Equity Interest Holder will retain all of the issued and outstanding stock in Debtor. The Class 9 Equity Interest Holder's vote will not count towards votes tabulated for purposes of any possible cramdown under Section 1129(b).

**D.9.2**   The Class 9 Equity Interest Holder's Claim is Impaired under the Plan.

**D.10**    **Payments to the United States Trustee**: The Reorganized Debtor shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. 1930(a)(6).  Any fees due as of the date of the Confirmation Hearing will be paid in full on the Effective Date of the Plan. After confirmation, the Reorganized Debtor shall pay United States quarterly fees as they accrue until this case is closed by the Bankruptcy Court.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.

**E.     IMPLEMENTATION OF THE PLAN**

Continued Operations of RWDY: The Reorganized Debtor shall continue to operate its business following the Effective Date. The Reorganized Debtor shall only be required to timely fund and transfer to recipients authorized under the proposed Plan the Debtor Distributions, Professional Fee Claims, including, but not limited to, the Debtor's and Reorganized Debtor's attorneys and other professionals, United States Trustee quarterly fees incurred pursuant to 28 U.S.C. 1930(a)(6), and the Monthly Distribution Amounts required to be distributed to the RWDY Distribution Trust.

Post Effective Date Management: The Reorganized Debtor shall continue to exist after the Effective Date in accordance with the applicable laws of the State of Texas, in which it was formed, for the purposes of operating its business and satisfying its obligations under the Plan. The Reorganized Debtor shall be owned by Kenneth A. Lowery who will serve as President and CEO of the company. For serving as President and CEO of the Reorganized Debtor, Kenneth A. Lowery shall be paid a fixed annual salary of $350,000.00 in monthly, or semi-monthly installments. For serving as Secretary/Treasurer and CFO of the Reorganized Debtor, Michael D. Bruce shall be paid a fixed annual salary of $160,000.00 in monthly, or semi-monthly installments. Kenneth A. Lowery and Michael D. Bruce will serve as directors of the Reorganized Debtor unless and until any of such directors resign, are incapacitate, or are replaced. They will not receive any additional compensation for that service. If upon consideration of the Reorganized Debtor's

financial wellbeing, in Management's sound business judgment, to the extent that it is determined to be appropriate, in addition to their fixed annual salary the Reorganized Debtor may pay an annual bonus to Kenneth A. Lowery and Michael D. Bruce.

Corporate Action: The entry of the Confirmation Order shall constitute authorization for the Reorganized Debtor to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation. The management of the Reorganized Debtor is authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor and Reorganized Debtor.

Documents: All documents necessary for the implementation of the proposed Plan shall be executed by all necessary parties in interest on the Effective Date, unless an earlier date is provided for a particular document or documents under the proposed Plan. To the extent that the parties in interest herein are unable to agree on the form or substance of such documents, such unresolved issues shall be submitted to the Court for determination. Upon the Effective Date, or as soon as practicable thereafter, the Court shall have resolved said issues and all such documents shall be binding on the Debtor, the Creditors, and all other parties hereto.

Re-Vesting of Assets: On the Effective Date, except as otherwise provided in the proposed Plan, title to all of the Debtor's assets shall vest in the Reorganized Debtor free and clear of all liens, Claims, Causes of Action, interests, security interest and other encumbrances and without further order of the Bankruptcy Court. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire and dispose of its assets free of any restriction of the Bankruptcy Code.

Incorporation of Bankruptcy Rule 9019: To the extent necessary to effectuate and implement the compromises and releases contained in the Plan, the Plan shall be deemed to constitute a motion under Bankruptcy Rule 9019 seeking the Bankruptcy Court's approval of all of the compromises contained herein.

Incorporation of Valuation Motion: To the extent necessary to effectuate and implement the provisions of the proposed Plan, the Plan shall be deemed to constitute a motion for valuation under the Bankruptcy Code, including to value any lien, security interest, or encumbrance treated by the proposed Plan; provided, however, that nothing in the proposed Plan shall alter any valuation ordered by Final Order of the Bankruptcy Court in the Chapter 11 Case.

Automatic Stay: The automatic stay provided in Section 362 of the Bankruptcy Code, shall remain in effect through the Effective Date, unless otherwise specifically modified, annulled, or

terminated by the Bankruptcy Court pursuant to a separate order, and shall terminate on the Effective Date.

Corporate Organizational Documents: The Corporate Organizational Documents have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity member interests to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code. The Corporate Organizational Documents have been or will be amended on or prior to the Effective Date to provide the following:

Rights Under 1129(b): If any impaired class votes to accept the Plan, but not all classes accept the Plan; the Debtor will seek confirmation under the cram down provisions of Section 1129(b) of the Bankruptcy Code and hereby gives notice of intent to invoke the cram down provisions of Section 1129(b) in that event.

## F.   DISPOSITION OF CAUSES OF ACTION

The Debtor has not yet concluded its analysis of existing claims and Causes of Action and expressly reserves the right to continue such analysis.

Retention and Enforcement of Causes of Action: "Cause of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, promises, warranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Cause of Action also includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 551, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code. All Causes of Action that may be pursued exclusively by the Debtor.

Retention and Enforcement of Specific Causes of Action and Claims: Confirmation of the Plan shall operate to preserve and retain the Debtor's and Reorganized Debtor's right, right of action, and standing to bring and enforce actions belonging to the Estate post-confirmation. The Specific Causes of Action and Claims retained by the Debtor shall include, but not be limited to, the following:

(i) The Debtor's and the estate's claims, rights, and Causes of Action against any Merchant Cash Advance Lender, including, without limitation, any objection to the

29

existence, amount, status, extent, validity and priority of such Merchant Cash Advance Lender's claim, further including, any counterclaim against such Merchant Cash Advance Lender, any Claim or Cause of Action existing in favor of the Debtor against such Merchant Cash Advance Lender, any Claim or Cause of Action arising under Chapter 5 of Title 11 against such Merchant Cash Advance Lender, any claim whether one or more of the MCA Lenders has violated 18 U.S.C. § 152(4); any claim whether one or more of the MCA Lenders have civil liability to the Debtor on account of the claim(s) filed by such MCA Lender; whether one or more of the MCA Lenders has violated 18 U.S.C. § 1962; and any subordination Causes of Action arising under Section 510 of the Bankruptcy Code or other applicable law against such Merchant Cash Advance Lender.

(ii) The right to enforce and collect the judgment entered by the Court on April 12, 2023, in Adversary Proceeding No. 23-01003, in favor of RWDY, INC and against Brian T. Owen in the full and true sum of $27,204,990.83, and ordering Brian T. Owen to account for and turnover funds in that amount to RWDY, INC for judicial interest on the aforesaid amount from the date of the judgment until paid in full, and for all costs of the adversary proceeding.

(iii) Any and all claims against The Hartford and/or Twin City Fire Insurance Company, including, without limitation, RWDY's claim under Policy No.: 43 KB 0354366-22; Claim No.: 22437868, asserted as a result of Owen's theft from RWDY;

(vi) Any and all other claims, rights, and Causes of Action which the Debtor and/or the estate holds against any Entity for payment due on account of services performed for and goods provided to or for the benefit of such Entity by the Debtor or one or more affiliates of the Debtor.(v) Causes of Action of the Debtor to recover money or property from customers, vendors and/or employees whether based on contract or tort, including without limitation all rights pursuant to Section 502(d) of the Bankruptcy Code to assert and prosecute any Causes of Action of the Debtor against creditors solely for the purpose of establishing that a creditor's Claim against the Estate must be disallowed for failure to repay an avoidable transfer.Equitable subordination Causes of Action arising under Section 510 of the Bankruptcy Code or other applicable law, other than as compromised herein. The foregoing may be supplemented by the Plan Supplement.

### G.     EXECUTORY CONTRACTS AND LEASES

<u>Assumption of the Master Service Agreements</u>:  On the Effective Date, the Master Service Agreements between the Debtor and the counterparties to the Master Service Agreements shall be assumed.  The Plan and the Confirmation Order shall constitute an order approving the

assumption. The Master Service Agreements shall be retained by the Reorganized Debtor pursuant to the Plan.

General Assumption of All other Executory Contracts: All executory contracts and unexpired leases of the Debtor including, but not limited to, the Master Service Agreements and all other executory contracts and unexpired leases listed on the Debtor's Schedules, which are not expressly rejected on or before ninety (90) days after the Confirmation Date or not otherwise specifically treated in the Plan or in the Confirmation Order shall be deemed to have been assumed on the Confirmation Date. The Bankruptcy Court shall retain jurisdiction to effectuate any post-confirmation assumption and assignment of leases, and such assumption and assignments shall be performed pursuant to Section 365 of the Bankruptcy Code. Each prepetition executory contract and unexpired lease will be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Listing a contract or lease as an executory contract or unexpired lease will not constitute an admission by the Debtor, or the Debtor-in-Possession that such contract or lease is an executory contract or unexpired lease or that the Debtor, or the Debtor-in-Possession, has any liability thereunder. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving assumption under Section 365 of the Bankruptcy Code as of the Effective Date. The Reorganized Debtor shall continue to have all rights of assignment contained in 11 U.S.C. § 365 of any executory contract or unexpired lease following Confirmation of the Plan.

Cure of Defaults: Unless otherwise provided for in the Plan, the Reorganized Debtor shall cure all defaults existing under any assumed Executory Contract pursuant to the provisions of Sections 1123(a)(5)(G) and 365(b) of the Bankruptcy Code, by paying the amount, if any, claimed by any party to such Executory Contract as set forth in a proof of claim, which shall be filed with the Court upon the earlier of (a) 30 days after express notice is given of the Debtor's intent to assume such Executory Contract or (b) within sixty (60) days after the Confirmation Date. Such proof of claim shall be titled "Assumption Cure Proof of Claim." Alternatively, the Reorganized Debtor may pay such amount as may be agreed upon between the Reorganized Debtor and any party to such Executory Contract, provided an Assumption Cure Proof of Claim is timely filed within thirty (30) days after the Confirmation Date. Payment of any amount claimed in an Assumption Cure Proof of Claim or otherwise agreed to shall be in full satisfaction, discharge and cure of all such defaults (including any other Claims filed by any such party as a result of such defaults), provided, however, that if the Reorganized Debtor files, within forty-five (45) days of the filing of an Assumption Proof of Claim, an objection in writing to the amount set forth, the Court shall determine the amount actually due and owing with respect to the defaults or shall approve the settlement of any such Claims. Payment of such Claims shall be made by the Reorganized Debtor on the later of: (i) ten (10) Business Days after the expiration of the forty-five-day (45) period for filing an objection to any Assumption Cure Proof of Claim filed pursuant to this section; or (ii) when a timely objection is filed, within ten (10) Business Days after an order of the Court allowing such Claim becomes a Final Order.

31

Claims for Damages: Any Claims based upon rejection of an executory contract or unexpired lease under the Plan must be filed with the Bankruptcy Court and served on the Reorganized Debtor such that they are actually received within thirty (30) days of the entry of an order rejecting such contract or lease. Objections to any such proof of claim shall be filed not later than thirty (30) days after receipt of such claim. The Court shall determine any such objections, unless they are otherwise resolved. All Allowed Claims for rejection damages shall be treated as a Class 8 General Unsecured Claim. Any Claim not filed within such time will be forever barred from assertion against the Debtor or its Estate.

Reservation of Rights: The Debtor reserves the right to file applications for the assumption or rejection of any executory contract or unexpired lease at any time prior to ninety (90) days after the Confirmation Date.


H.      **RESOLUTION OF DISPUTED CLAIMS**

Only Allowed Claims will be paid by Debtor according to the Plan. An Allowed Claim is any Claim against the Debtor for which a proof of claim was timely and properly filed or is deemed to have been timely and properly filed because the Debtor has or hereafter does not list such Claim on its schedules as unliquidated, disputed or contingent and as to which no objection was filed by the Claims Objection Deadline.

Standing: Except as otherwise provided by prior order of the Court, the Debtor and/or the Reorganized Debtor will have standing to object to Claims and proofs of claim before the Claims Objection Deadline, which is 90 days after the Effective Date of the proposed Plan.

Effect of Bar Date: In accordance with Federal Rule of Bankruptcy Procedure 3003(c) any Creditor whose claim was not scheduled, or holds a Contingent Claim, Unliquidated Claim, or Disputed claims, and did not file a proof of claim before the Bar Date or thereafter as allowed by Order of the Court, shall not be treated as a Creditor with respect to such claim for purposes of voting or distribution.

Amendments to Claims; Claims Filed After the Confirmation Date: Except as otherwise provided in the Plan, and subject to the Bar Date, a Claim may not be amended after the Confirmation Date without prior authorization of the Bankruptcy Court. Except as otherwise provided in the Plan, any amended Claim filed with the Bankruptcy Court after the Confirmation Date shall be deemed disallowed in full and expunged without the need for any action by the Reorganized Debtor.

Objection Deadline: Within ninety (90) days from the Effective Date, unless such date is extended by Order of the Court after notice and hearing, the Reorganized Debtor may file with the Court objections to Claims and interests and shall serve a copy of each such objection upon the Holder of the Claim or interest to which such objection pertains. Unless arising from an

Avoidance Action, any proof of Claim filed after the Effective Date shall be of no force and effect and need not be objected to. Any Undetermined Claim may be litigated to Final Order. The Reorganized Debtor may compromise and settle any Undetermined Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any settlement of an Undetermined Claim after the Effective Date; provided, however, no settlement shall in any way alter, vary, modify or otherwise adversely impact any of the rights provided to any party-in-interest contained in the Plan. Nothing in this Plan extends the Bar Date set in the Chapter 11 Case or grants any Creditor any greater rights with respect to a late-filed Claim than such Creditor otherwise has. Unless otherwise ordered by the Court, the Reorganized Debtor shall litigate to judgment, settle or withdraw objections to Contested Claims and/or Disputed Claims.

Creditor Response to Objection: With respect to any objection to a Claim when such objection is filed after the Effective Date but otherwise in compliance with the proposed Plan, the Creditor whose Claim was the subject of the objection must file with the Bankruptcy Court and serve a response to the objection upon the Reorganized Debtor no later than thirty (30) days from the date of service of any such objection. Failure to file and serve such a response within the thirty (30) days shall cause the Bankruptcy Court to enter a default judgment against the non-responding Creditor and thereby grant the relief requested in the objection without further notice to such Creditor. Any such objection shall contain prominent negative notice language informing the objected-to creditor of the same. This requirement notwithstanding: should the Objection to Claim be asserted in an Adversary Proceeding, the response will be superseded by any Scheduling Order or other Order fixing a response date applicable to the action.

No Payment Pending Allowance: Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed or is an Undetermined Claim, then no payment or distribution hereunder shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

Estimation of Claims: The Debtor or the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to 11 U.S.C. § 502(c), regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor, the Reorganized Debtor of The RWDY Distribution Trust may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated subsequently and

compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

Allowance of Claims:  At the time, and to the extent that an Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to such distributions provided under the Plan.  Such distributions shall be made in the manner provided for by the proposed Plan, the terms of any Final Order of the Court with respect to such Allowed Claim and the RWDY Distribution Trust.  If an allowed claim exceeded the scheduled amount, neither the interest rate nor the monthly payment amount shall be modified; instead, the term shall be sufficiently extended to fully pay the Allowed Claim.

## I.     RETENTION OF JURISDICTION

Purposes:  Notwithstanding entry of the Confirmation Order, this Court shall retain jurisdiction over the Chapter 11 Case for the following purposes:

A.  to determine any and all objections to the allowance of Claims or interests, both before and after the Confirmation Date, including any objections to the classification of any Claim or interest;

B.  to determine any and all applications for fees and expenses authorized to be paid or reimbursed in accordance with Section 503(b) of the Bankruptcy Code or this Plan;

C.  to determine any and all pending applications for the assumption or rejection of executory contracts or for the rejection or assumption and assignment, as the case may be, of unexpired leases to which the Debtor is a party or with respect to which it may be liable; to hear and determine any actions to void or terminate unexpired contracts or leases; and to hear and determine and, if need be, to liquidate any and all claims arising therefrom;

D.  to hear and determine any and all actions initiated by the Reorganized Debtor or the RWDY Distribution Trust, whether by motion, complaint or otherwise;

E.  to determine any and all applications, motions, adversary proceedings and contested matters pending before the Court on the Confirmation Date or filed or instituted after the Confirmation Date;

F.  to modify this Plan, the Disclosure Statement or any document created in connection with this Plan or remedy any defect or omission or reconcile any inconsistency in any Order of the Court, this Plan, the Disclosure Statement or any document created in connection with this Plan, in such manner as may be necessary to carry out the purposes and effects of this Plan to the extent authorized by the Bankruptcy Code;

G. to ensure that the Distributions under the Plan are accomplished in accordance with the provisions of this Plan;

H. to allow, disallow, determine, liquidate or estimate any Claim or interest and to enter or enforce any Order requiring the filing of any such Claim or interest before a particular date;

I. to enter such Orders as may be necessary to interpret, enforce, administer, consummate, implement and effectuate the operative provisions of the proposed Plan, the Confirmation Order and all documents and agreements provided for herein or therein or executed pursuant hereto or thereto including, without limitation, entering appropriate Orders to protect the Debtor from creditor actions;

J. to hear any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

K. to enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated;

L. to determine such other matters as may arise in connection with the proposed Plan, the Disclosure Statement or the Confirmation Order;

M. to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case;

N. to determine all issues relating to the Claims of the IRS, and other taxing authorities, state or federal;

O. to determine any avoidance actions brought pursuant to the provisions of the Bankruptcy Code; and

P. to enter a Final Order and final decree closing the Chapter 11 Case.

Exclusive Jurisdiction: The Court shall have exclusive jurisdiction to resolve all controversies, suits and disputes that may arise in connection with the interpretation, enforcement, consummation, implementation or administration of the proposed Plan, the Confirmation Order, the Disclosure Statement or the RWDY Distribution Trust and **all entities shall be enjoined from commencing any legal or equitable action or proceeding with respect to such matters in any other court or administrative or regulatory body**. This provision shall not alter or change the provisions of the proposed Plan addressing the Seacoast Claim.

Abstention:  If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Case, including the matters set forth in this Article XI which shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

35

**J.** **DISCHARGE**

If the Plan is confirmed by the Bankruptcy Court, the Debtor will receive a discharge under Chapter 11 of the Bankruptcy Code. In conjunction with that discharge, the Bankruptcy Code automatically imposes certain injunctions, which generally prohibit a Creditor from pursuing or collecting on a discharged Claim as against the Reorganized Debtor or its property. All Creditors would be able to pursue Claims and seek recovery only under the terms of the Plan, and not against the Reorganized Debtor or its property except as provided for in the Plan. Collection activities on account of discharged Claims could constitute serious violations of the law and could subject the violator to serious penalties, including contempt, money damages, and punitive damages.

*THE PLAN CONTAINS PERMANENT INJUNCTIONS THAT MAY PREVENT YOU FROM SEEKING TO ASSERT OR COLLECT YOUR CLAIM EXCEPT THROUGH THE PLAN. YOUR RIGHTS MAY BE SEVERELY IMPACTED. STUDY THE PLAN CLOSELY AND CONSIDER CONSULTING WITH LEGAL COUNSEL REGARDING THE PLAN AND YOUR RIGHTS AND LIMITATIONS THEREUNDER.*

Discharge of Debtor. Except as otherwise provided in the Plan or in the Confirmation Order, any consideration Distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor or any of its assets or properties; and except as otherwise provided herein, upon the Effective Date, the Debtor shall be deemed discharged and released to the extent permitted by Section 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of the Claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. Except as provided herein, pursuant to Section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtor or the property of the Debtor, to the extent it relates to a Claim discharged.

**ARTICLE VII**
**VOTING PROCEDURES AND REQUIREMENTS**


**A.      CREDITORS SOLICITED TO VOTE**

Each Creditor holding a Claim in a Class that is Impaired under the Plan is being solicited to vote on the Plan.  As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount determined by the Bankruptcy Court.  Such motion must be heard and determined by the Bankruptcy Court prior to the date and time scheduled by the Bankruptcy Court for a hearing determining the confirmation of the Plan.  Further, the Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provision of the Bankruptcy Code.


**B.      DEFINITION OF IMPAIRMENT**

Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims is Impaired under a Plan unless, with respect to each Claim of such Class, the plan does at least one of the following two (2) things:

(i)      leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim; or

(ii)     notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

(a)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

(b)      reinstates the maturity of such claim as it existed before the default;

(c)      compensates the holder of such Claim for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

(d)     does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such Claim.

The Plan identifies the classes of Creditors and Interests that the Debtor believe are Impaired or Unimpaired under the Plan.  The Plan cannot and does not change the law on what is an Impaired class and, to the extent a Creditor disagrees with the Debtor's identification of Impaired or unimpaired classes, the Creditor may object to the Plan and the Bankruptcy Court will decide the dispute.

## C.      CLASSES IMPAIRED UNDER THE PLAN

All Classified Classes of Claims are Impaired under the Plan. All Creditors holding Claims within Classes 1, 2, 3, 4, 5, 6, 7, 8 and 9 are being solicited to vote on the Plan.

With respect to the foregoing, the Debtor specifically reserves its right to determine and contest, if necessary: (a) the Impaired or Unimpaired status of a Class under the Plan; and (b) whether any Ballots cast by Creditors holding Claims within such a class should be counted for purposes of confirmation of the Plan.

## D.      VOTE REQUIRED FOR CLASS ACCEPTANCE

Pursuant to the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-third (2/3) in amount and more than half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.  It is important to note that, pursuant to the Bankruptcy Code, a Class vote in favor of the Plan will be binding even on those creditors in the Class who vote against the Plan, so long as the requisite voting percentages are obtained in favor of the Plan.

## E.      SPECIFIC CONSIDERATIONS IN VOTING

While the Plan provides for certain payments at Confirmation, such payments will only apply to Allowed Claims including Claims arising from defaults.  Under the Bankruptcy Code, a Claim may not be paid until it is Allowed.  A Claim will be Allowed in the absence of objection.

A Claim, including a Claim arising from default, which has been objected to will be heard by the Court at a regular, evidentiary hearing and Allowed in full or in part or disallowed. While the Debtor bears the principal responsibility for Claim objections, any interested party, including Creditors, may file claim objections. Accordingly, payment on some Claims, including Claims

arising from defaults, may be delayed until objections to such Claims are ultimately settled. Parties should also read and consider the Risk Factors discussed and analyzed in Article IX of this Disclosure Statement.

## ARTICLE VIII
## LIQUIDATION AND PLAN ALTERNATIVES

**A. LIQUIDATION ANALYSIS**

In order to confirm a Plan, the Bankruptcy Code requires that each Impaired class of claims must receive or retain at least the amount of value, on the effective date, it would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor's Accountant has prepared a Liquidation Analysis, and a copy is attached as Exhibit 6. The analysis addresses (i) liquidation based on projected claims allowed and claims provided for under the Plan.  Based on the Liquidation Analysis, Unsecured Creditors would receive approximately 35.5% of their filed claim amounts in a liquidation. Debtor does not anticipate that the Merchant Cash Advance Lender Claims will be allowed; if , however, they are allowed, Unsecured Creditors would receive approximately 1.45% of their filed claim amounts in a liquidation.

The Liquidation Analysis demonstrates the estimated results of a liquidation of the Debtor.  The Debtor would note that this estimation is uncertain, and is by definition speculative. The Debtor has not retained a third party to perform the estimate and thus the numbers and figures are based upon the Debtor's best educated and good faith analysis of the value of the assets and their distribution under the liquidation scheme of Chapter 7 of the Bankruptcy Code. Further, the Debtor advises its Creditors of the following facts, all affecting the liquidation analysis:

    i.    The Debtor is in the business of providing consultant, management, and related services through employees and third parties ("RWDY's Consultants") to its clients. The Debtor's most significant asset is its Receivables due from its clients/customers for the work performed by RWDY's Consultants. Generally, payments to RWDY's Consultants come due at the end of a two and/or four-week period, and RWDY's Consultants must be paid immediately. RWDY uses Seacoast Business Funding ("Seacoast") to factor its invoices. This provides immediate payment to RWDY's Consultants and immediate revenue for RWDY's operations. The invoices are processed by and through Seacoast.  After collecting the invoices, Seacoast reconciles its accounts with RWDY. On December 21, 2022, RWDY's receivables.  If this case were converted to a Chapter 7 case, the factoring process would be terminated immediacy. Seacoast has a first priority ownership interest

in purchased accounts and a first priority secured interest in the Receivables, and it is the Debtor's opinion that approximately 15% of the outstanding receivables could be consumed by the reconciliation/settlement with Seacoast.

ii. The exploration and production component of the Oil, Gas and Mineral sector has always been built on personal relationships. The cause and significance of this truth may be enigmatic, but is indubitable. While the Master Service Agreements have value to RWDY, generally, they are cancelable at will and would have little or no value to anyone other than RWDY vested with its key personnel.

Therefore, in a liquidation, Unsecured Claims would likely receive substantially less than under the Plan. Further, distributions, if any, to Unsecured Claims would not be made for a period of 1 to 2 years after conversion of the Bankruptcy Case. Consequently, the Debtor believes that the Plan is a far superior alternative for Creditors.

## B. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtor has evaluated several alternatives to the Plan, including the non-bankruptcy liquidation of the Debtor. The Debtor is not an "asset based" business. After reviewing the analysis of these alternatives, the Debtor concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, assuming confirmation of the Plan. As noted, liquidating the Debtor's business would not maximize the value of the assets and would lead to its Creditors receiving substantially less than the amounts proposed in the Plan. The Plan will also enable RWDY to continue operations and fund full payments to its Creditors, for the benefit of all Creditors and Interest Holders. Principally, the Discussion related to the Liquidation Analysis is the basis for Debtor's conclusion that the Plan will provide the highest value to the Holders of Claims.

## C. LIQUIDATION ALTERNATIVE THROUGH CHAPTER 7

The Debtor has analyzed whether a chapter 7 liquidation of its assets would be in the best interests of the Claim and Interest Holders. Debtor's account prepared the Liquidation Analysis which demonstrates that the liquidation value is substantially lower than the value that may be realized through continued operations of the Debtor should the Plan be confirmed. As shown graphically in Exhibit 6, Unsecured Creditors would receive approximately .35.5% of their allowed filed claim amounts in a Chapter 7 liquidation. The Debtor believes that liquidation would result in substantial diminution in the value to be realized by Holders of Unsecured Claims because of:

(i)     the failure to realize the greater going-concern value of the Debtor's assets;

(ii)    additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and potentially other professionals to assist such trustee in the case of a chapter 7 proceeding;

(iii)   the diminution of the value of the receivables resulting from the reconciliation/settlement with Seacoast; and

(iv)    the substantial time which would elapse before the Creditors would receive any distribution in respect to their Claims.

Consequently, the Debtor believes that the Plan provides a substantially greater and more immediate return to Holders of Claims than would a liquidation through Chapter 7.

## D.     DISMISSAL ALTERNATIVE

Dismissal of the Chapter 11 Case would most likely lead to the same unsatisfactory result as a Chapter 7 liquidation.

## E.     FUTURE PROJECTIONS

For all of these and other reasons, the Debtor believes that continuing to operate its business and reorganizing is much preferable to the alternatives listed and explained herein and is in the best interest of the Debtor and its Creditors.  The Debtor has analyzed its anticipated future financial performance and business operations, and believes that it will be able to fund and pay all obligations required by the Plan, including all future operational expenses, taxes and other ongoing obligations.  A copy of the Debtor's Estimated Future Income and Expenses is attached as Exhibit 7.

## ARTICLE IX
## RISK FACTORS

## A.     ESTIMATED RECOVERY RISKS

The Plan will be funded through two primary sources.  The Plan will initially be funded by cash on hand at confirmation, which cash will be used towards Administrative Claims, Professional Claims and Priority Claims. Since the cash needed to pay these Claims will be on

deposit with the Debtor in order for the Plan to become effective, there is little risk of these payments not being made in full.

With respect to Claims to be paid out over time under the Plan, including the Secured Claims and the General Unsecured Claims, there is more risk as payments to these Creditors will be made from the revenue and cash flow of the Debtor's future operations. Therefore, these Creditors will have more risk in obtaining full payment given the always present uncertainty concerning future events. Here, many factors will affect the Debtor's future performance, including the overall economy, the stability and resurgence of the national and local oil and gas industry and the Debtor's expansion into the heavy manufacturing sector. A full discussion of these factors and issues is outside the scope of this Disclosure Statement, except to note that the Debtor's future performance and revenue, and therefore future payments to Creditors under the Plan is subject to risk that should be taken into account when voting on the Plan.

However, the Debtor believes that this risk is nominal and that it is not so material as to jeopardize recoveries under the Plan. The Debtor's financial projections attached to this Disclosure Statement demonstrate that the Debtor will be able to make all future payments required by the Plan. Thus, for these and other reasons, the Debtor believes that it will be able to pay in full all future obligations under the Plan, and while it advises affected Creditors of the risk of future payment, it encourages those Creditors to consider the Debtor's projections, historical performance and other factors discussed above.

**B. BANKRUPTCY RISKS**

<u>Insufficient Acceptances</u>:  For the Plan to be confirmed, each Impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such Impaired voting Classes, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Voted Claims of the Class voted.  On those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtor intends to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code if necessary, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Debtor would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

<u>Confirmation Risks</u>:  The following specific risks exist with respect to confirmation of the Plan:

a.   Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

b.      Since the Debtor may seek to obtain approval of the Plan over the rejection of one or more Impaired Classes of Claims, the cramdown process could delay confirmation.

Conditions Precedent:  Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur, including but not limited to the Confirmation Order being entered by the Bankruptcy Court. The Debtor, however, will work diligently with all parties in interest to ensure that all conditions precedent are satisfied.

## ARTICLE X
## CERTAIN TAX CONSEQUENCES OF THE PLAN

THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. ALSO, THERE MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR.  CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.  NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY TAX ADVICE TO ANY CREDITORS, INTEREST HOLDER OR PARTY IN INTEREST.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

Disclosures Required by the Bankruptcy Code:  The Bankruptcy Code requires disclosure of certain facts:

(i) There are no payments made or promises of the kind specified in Section 1129(a)(4) of the Bankruptcy Code which have not been disclosed to the Court.

(ii) Counsel to the Debtor has advised the Debtor that the Debtor will require legal services in connection with this case after confirmation which will require reimbursement. Debtor may continue to use Robert W. Raley, Esq., 290 Benton Spur Road, Bossier City, LA 71111 and Ayers, Shelton, Williams, Benson & Paine, LLC, 333 Texas Street, Shreveport, LA 71101, as counsel after confirmation.

Certain Rights Unaffected: Except as otherwise provided in the Plan, any rights or obligations which the Debtor's Creditors may have amongst them as to their respective claims or the relative priority or subordination thereof are unaffected.

Binding Effect:  As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Debtor, the Holders of the Claims, and their respective successors and assigns.

Injunctive Relief. Except as provided in the proposed Plan, on and after the Confirmation Date, all Creditors and persons acting in concert with them shall be enjoined and restrained pursuant to Section 105 of the Code from taking any action to collect or enforce any Claim directly or indirectly against the Reorganized Debtor or the RWDY Distribution Trust in any manner inconsistent with the terms contained in the Plan. The discharge granted by the Plan will void any judgment at any time obtained with respect to any debt discharged.

*THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY CLAIM OR DEBT AGAINST THE DEBTOR WHICH IS ADDRESSED IN THE PLAN SHALL BE PAYMENT OR DISTRIBUTION UNDER AND FROM THE PLAN, THE RWDY DISTRIBUTION TRUST AGREEMENT, AND/OR THE RWDY DISTRIBUTION TRUST. ALL PARTIES HOLDING CLAIMS, WHETHER ALLOWED OR DISALLOWED, ARE ENJOINED FROM TAKING ANY OTHER ACTION, INCLUDING, BUT NOT LIMITED TO, ANY ACTION TO PROSECUTE OR COLLECT ANY DEBT OR CLAIM AGAINST ANY INSIDER, OFFICER, DIRECTOR, EMPLOYEE, SHAREHOLDER OR AFFILIATE OF THE DEBTOR, UNLESS AND UNTIL THERE SHALL BE A COURT ORDER TERMINATING THIS INJUNCTION BECAUSE OF THE OCCURRENCE OF A DEFAULT OF THE REORGANIZED DEBTOR [AS THAT TERM IS DEFINED UNDER THE PLAN] TO MAKE TWO OR MORE DISTRIBUTIONS UNDER THE PLAN REQUIRED TO BE MADE BY THE REORGANIZED DEBTOR DIRECTLY TO THE HOLDERS OF ALLOWED CLAIMS OR TO THE RWDY DISTRIBUTION TRUST. TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM THE RWDY DISTRIBUTION TRUST AND ANY THIRD PARTY IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE PETITION DATE UNTIL THE DATE UPON WHICH THIS INJUNCTION IS TERMINATED.*

Notices:  All notices, requests or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing, provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following parties, addressed to:

**Debtor:**

RWDY, Inc.
4717 Viking Drive
Bossier City, LA 71111
lowery@rwdyinc.com

**Debtor's Counsel:**

Robert W. Raley, Esq.
290 Benton Spur Road
Bossier City, LA 71111
(318) 747-2230
bankruptcy@robertraleylaw.com
Attorney for Debtor

Curtis Shelton
Ayres, Shelton, Williams, Benson & Paine, LLC
PO Box 1764
Shreveport, LA 71166
(318) 227-3500
curtisshelton@awsw-law.com
Attorneys for Debtor

All notices and request to Holders of Claims and Interests shall be sent to the address listed on the last-filed proof of claim and if no proof of claim is filed, at the address listed in the Debtor's Schedules.

**ARTICLE XII**
**CONCLUSION**

The Debtor respectfully submits that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest of creditors "and "feasibility" requirements and that it should be confirmed even in the event a class of claims does not vote for acceptance of the Plan. The Debtor believes that the Plan "is fair and equitable" and "does not discriminate unfairly." Additionally, the Debtor believes that the Plan has been proposed in good faith.

The Debtor respectfully requests that this Disclosure Statement be approved for circulation to the creditors of the Debtor and that it be permitted to solicit votes for acceptance of the Plan.

Dated: October 17, 2023.

RWDY, Inc.,

By: /s/ Kenneth A. Lowery
     President RWDY, Inc.

Respectfully submitted,

ROBERT W. RALEY ESQ.

By: /s/ Robert W. Raley
Robert W. Raley, La. Bar #11082
290 Benton Spur Road
Bossier City, LA 71111
Telephone: 318-747-2230
bankruptcy@robertraleylaw.com
Attorney for the Debtor

And

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC
/s/ Curtis R. Shelton
La. Bar Roll No. 17137
Suite 1400, Regions Tower
333 Texas Street (71101)
P.O. Box 1764
Shreveport, LA 71166-1764
Telephone: (318) 227-3500
Facsimile: (318) 227-3806
E-mail: curtisshelton@awsw-law.com
Attorneys for the Debtor