**SO ORDERED.**

**DONE and SIGNED March 24, 2025.**



_____
**JOHN S. HODGE
UNITED STATES BANKRUPTCY JUDGE**

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Number: 22-11308 |
| | § | |
| RWDY, Inc. | § | Chapter 11 |
| | § | |
| Debtor | § | |

**Memorandum Opinion and Order**

    The Bankruptcy Code permits a trustee to employ professionals to perform services for the estate. A trustee may employ only disinterested persons that do not hold or represent an interest adverse to the estate.

    Here, the chapter 11 debtor employed accountants. The court awarded the accountants $139,000 in interim compensation. Thereafter, Debtor's management concluded that certain actions or inactions of the accountants enabled a prior officer of Debtor to embezzle millions of dollars. The accountants deny any wrongdoing. Once the dispute arose, the accountants ceased rendering services and did not seek additional compensation or file a final fee application.

    A party in interest seeks disgorgement of fees paid to the accountants on the grounds that they were not disinterested and held an interest adverse to the estate for the entirety of their employment. The moving party also asks the court to rescind its order authorizing the retention of the accountants on the same grounds.

    For the reasons stated, the relief requested is denied.

## Factual Background

RWDY, Inc. ("**Debtor**") is an oilfield consulting company headquartered in Bossier City, Louisiana. In 2020, Debtor filed its first chapter 11 case. In January 2021, this court confirmed Debtor's plan of reorganization. As part of the plan, a distribution trust was established. The plan provided for the continuation of employment of Debtor's then-president, Brian T. Owen ("**Owen**"). Under the plan, Owen was entitled to a fixed salary plus additional compensation under certain conditions. If Owen received additional compensation, the plan required him to pay 30% of it to the distribution trust.

A few months after the plan was confirmed, Owen implemented a scheme to defraud the reorganized debtor and avoid paying a portion of his compensation to the distribution trust. His scheme was not complicated. He simply opened a new bank account on behalf of Debtor and concealed its existence from the other members of Debtor's management team. He did not list the account on Debtor's books. He then diverted funds belonging to Debtor into that account. After the funds were in the off-ledger account, he transferred them to his personal bank account and spent the money at casinos in Las Vegas.

Owen diverted millions of dollars into the off-ledger account and then siphoned the funds into his personal account for his sole benefit. He was later convicted of laundering over $3.8 million in the off-ledger account, but his money laundering and theft likely far exceeded that amount.[1]

After Owen's theft was discovered, he resigned as an officer of Debtor and forfeited his ownership interest in the company. Shortly thereafter, Debtor filed its second (current) bankruptcy case.

In the second case, like the first, the court authorized Debtor to employ as accountants Trent Millican ("**Millican**") and the accounting firm where he was employed. Millican signed a declaration in support of the Application which stated: "Neither I, my firm, Postlethwaite & Netterville, APAC, nor any member or associate thereof, have any interest adverse to that of the estate, the trustee, or the Debtor in the matters upon which I am proposed to be engaged." (Doc. 27, Decl. ¶ 2). He further attested: "I believe that I am a 'disinterested person' within the meaning of . . . the United States Bankruptcy Code." (Doc. 27, Decl. ¶ 4).

Debtor had a longstanding professional relationship with the accountants that predated its first bankruptcy case. For many years, the accountants performed virtually all accounting services for Debtor, except for making deposits and

---

[1] Owen pled guilty to one count of money laundering in violation of 18 U.S.C. § 1957 arising from the theft of funds. *United States v. Brian T. Owen*, No. 24-cr-00214-SMH-MLH in the United States District Court for the Western District of Louisiana.

managing accounts receivable. They rendered general accounting advice, prepared and filed all tax documents, reconciled all bank statements and paid various vendors and consultants. They also compiled financial statements and reviewed them to determine whether they were free from obvious errors. To perform their services, they utilized their electronic access to Debtor's books and bank accounts.

After the second bankruptcy case was filed, Debtor's management tried to untangle the financial mess created by Owen's misdeeds. By then, they were aware of the existence of the off-ledger account, but they did not have access to its records. In March 2024 – nearly a year and a half after the case was filed – management finally obtained possession of the records which were produced in response to a subpoena issued to Citizens National Bank of Bossier City where the off-ledger account was established. Those records show that the accountant, Millican, co-signed the account agreement which opened the account. As co-signer, Millican had authority to disburse funds from the account and had access to its records the entire time. These facts were previously unknown to management.

The subpoenaed records show that Owen started using the off-ledger account for illicit purposes almost immediately after it was opened on March 31, 2021. On April 5, 2021, Owen transferred $1,050,000 from Debtor's account at Seacoast Bank to the off-ledger account at Citizens Bank. A few weeks later, Owen transferred an additional $124,000 from the Seacoast account to the off-ledger account at Citizens. The Seacoast statement for April 2021 identified each said transfer as "WIRE TO CITZ NTL BK NA RWDY, INC." which plainly indicated that the money was sent to an account established in the name of RWDY, Inc. at Citizens National Bank.

The accountants were responsible for reconciling all bank statements monthly. One of the primary benefits of outsourcing bank reconciliations is to reduce the risk of intentional manipulation and fraud. Millican assigned someone in his firm to perform the reconciliations. The firm performed a reconciliation for the April 2021 Seacoast account, but did not notify Debtor's management team that the statement revealed that $1,174,000 had been transferred from that account to another account. Notably, the accountants did not create a bookkeeping entry to accurately reflect the transfer from one account to another or add the Citizens account to the chart of accounts. Also, they did not disclose that Millican had signed an account agreement to open the Citizens account.

In addition to transferring money from Debtor's legitimate bank accounts to the off-ledger account, Owen used the off-ledger account to deposit checks that were made payable to Debtor, including five such checks from the United States Treasury. On April 30, 2021, the accountants prepared and filed with the Internal Revenue Service a form showing that Debtor was entitled to receive Employee Retention Credits ("**ERC**"). ERCs are refundable tax credits for certain eligible businesses that had employees during the Covid-19 pandemic. Debtor qualified for

ERCs based on its financial statements for 2020 and 2021. After a long delay, the IRS issued checks payable to Debtor totaling $3.8 million for the ERC payments. Owen obtained possession of them and deposited them into the off-ledger account. Then, he transferred the money to his personal account that he owned jointly with Millican and another person.[2]

Owen also used the off-ledger account to conduct numerous transactions with six merchant cash advance ("**MCA**") companies. These transactions resulted in deposits from the MCA companies into the off-ledger account aggregating over $7.2 million and disbursements to the MCA companies from that account aggregating over $6.6 million. The net proceeds from such transactions were used by Owen to gamble at casinos or to satisfy gambling debts. The MCA transactions did not benefit Debtor in any way. The MCA companies eventually filed claims in this case exceeding $10 million.

After learning of Millican's role in establishing the off-ledger account and Owen's use of it to commit crimes, Debtor's management concluded that the accountants breached their standard of care owed to Debtor. The accountants denied any wrongdoing. They also denied knowledge of Owen's unlawful activities. Millican testified that he was unaware that any money had been deposited into the off-ledger account. He thought it was an inactive or closed account.

In April 2024, Debtor and the accountants severed their ties. Thereafter, Debtor made a written request to The Society of Louisiana Certified Public Accountants asking for review of numerous claims against the accountants. Under Louisiana law, before a client can file a malpractice lawsuit against an accountant, the client must first submit the claims for review.

As part of its confirmed plan and pursuant to a court-approved compromise with certain claimants, Debtor transferred its interest in the accounting malpractice claims to the liquidating trust created by the plan. The trustee of the liquidating trust is the party seeking relief.

**Discussion**

The request for disgorgement of fees paid to the accountants is analyzed

---

[2] The instant motion refers to the joint account as a "hidden" account, but it was disclosed by Debtor in the first bankruptcy case. *See* Case No. 20-10616, Doc. 243-29, Ex. 20, Disclosure Statement (listing gambling debts of Owen and attaching copies of bank statements which identify Millican as a joint account holder). Millican testified that he became an authorized signer of Owen's personal account in 2017 because he needed access to Owen's account statements to negotiate with the IRS regarding an installment plan. Millican also testified that he did not access the account after 2017. Millican did not receive any of the stolen funds deposited into the joint account.

under § 328 of the Bankruptcy Code which provides, in relevant part:

> the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c).

Under § 328(c), disgorgement is an authorized penalty for professionals who fail to satisfy the requirements of § 327.

Under § 327(a), a trustee is authorized to employ one or more professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." § 327(a). This section establishes the application of a two-pronged test for the employment of professional persons. A trustee may employ professionals with court approval only if (1) they do not hold or represent an interest adverse to the estate, and (2) they are disinterested persons.

A "disinterested person" is a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." § 101(14)(C).

The Bankruptcy Code does not define the phrase "interest adverse to the estate" as used in § 327(a) or "interest materially adverse to the estate" as used in § 101(14)(C). Courts, including the Fifth Circuit, have held that a "party has an 'adverse interest' to the estate if they: '(1) [ ] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) [ ] possess a predisposition under circumstances that render such a bias against the estate.'" In re Am. Int'l Refinery, Inc., 676 F.3d 455, 461 (5th Cir. 2012) (quoting In re West Delta Oil Co., 432 F.3d 347, 356 (5th Cir. 2005) (alterations in original)).

This court will apply the law developed under § 327 regarding disinterestedness and adverse interest to determine whether disgorgement is appropriate under § 328. The decision regarding disgorgement is within the discretion of the court. Id. at 461-62; In re Prince, 40 F.3d 356, 359 (11th Cir. 1994) ("[T]he language of 11 U.S.C. § 328(c) *permits* a court to deny compensation to professionals found not to be disinterested persons, but does not *require* a denial of

fees in those instances.") (emphasis in original). This is true even if the court learns that a professional never should have been employed under § 327(a) in the first place.

In this case, the motion alleges that Millican's "active role" in Owen's misdeeds and his "actions in concert with Owen" created an interest materially adverse to the estate. (Doc. 528, ¶ 49; Doc. 551, ¶ 34). According to the motion, at the time Millican signed his declaration, he: 1) had actual knowledge that "he had been instrumental in Brian Owen's misappropriation of millions of dollars from RDWY"; 2) knew or should have known that Owen had executed agreements with the MCA companies; and 3) knew or should have known that Owen had misappropriated funds and used them to gamble at casinos. (Doc. 528, ¶ 47).

Contrary to the trustee's allegations, the documentary evidence and testimony presented to this court did not establish that Millican acted "in concert" with Owen or was a co-conspirator with him or knowingly played an "active role" in Owen's misdeeds. The evidence also did not establish that Millican had actual knowledge of various transactions with the MCA companies. Nor did it establish that Millican knew that Owen used Debtor's funds to pay gambling debts.

While the evidence established that Millican knowingly helped Owen open the off-ledger account, it did not establish that he had actual knowledge that Owen used, or intended to use, that account for illicit purposes. Moreover, no evidence was presented to suggest that Millican financially benefitted from Owen's theft.

As for the trustee's contentions that Millican "should have known" about Owen's misdeeds, the court assumes he is suggesting that Millican, through the exercise of reasonable care and diligence, should have discovered Owen's use of the off-ledger account and owed a duty to inform Debtor's management team. In turn, the breach of that duty formed the basis of a cause of action belonging to the estate. The prepetition cause of action is an "interest adverse against the estate" because it is an economic interest "that would create either an actual or potential dispute in which the estate is a rival claimant." Am. Int'l Refinery, 676 F.3d at 461.

If that is the trustee's argument, the question becomes whether the accountants were disqualified under § 327(a) for a prepetition malpractice claim that was unknown at the time Millican signed his declaration. While all parties were aware of Owen's theft by the time the second bankruptcy case was filed, the dispute between Debtor and Millican did not emerge until nearly one and a half years later. As soon as the dispute emerged, Millican stopped working for the estate and did not seek additional fees.

If the accountants had been awarded compensation for services rendered *after* the emergence of a dispute with their client, this would be an easy case.

Disgorgement would be appropriate under that circumstance because the accountants and the estate would be rival claimants. Even the accountants would likely concede that point.

A more difficult question is whether the accountants should be required to disgorge fees for services rendered *before* Debtor accused them of malpractice and *before* they were aware that their actions or inactions might plausibly be construed as malpractice. The court, however, will not entertain that question because the trustee's motion and post-trial brief state, as the exclusive grounds for relief, that Millican "knowingly," "intentionally" or "recklessly" made a misrepresentation to this court about his firm's disinterestedness and lack of adversity. (Doc. 528, ¶¶ 49, 50; Doc. 551, ¶¶ 30, 35, 36). The trustee does not seek disgorgement based on Millican's *mistaken* belief that his firm was disinterested.

While there may be solid evidence to support the estate's causes of action based on negligence, the evidence does not support a finding that Millican "knowingly," "intentionally" or "recklessly" made misrepresentations to this court about his firm's disinterestedness and lack of adversity.

Lastly, the court notes that Bankruptcy Rule 2014 requires professionals to disclose all connections with parties in interest.[3] The motion, however, did not challenge the adequacy of the accountants' disclosure of such connections. Bankruptcy Rule 9013 provides that a motion must state its grounds "with particularity." Fed. R. Bankr. P. 9013; *see also* IRS v. Taylor, 132 F.3d 256, 262 (5th Cir. 1998) (reiterating this requirement). The court will limit its ruling to the grounds for relief specified in the motion. Therefore, the court will not examine whether the accountants adequately disclosed their connections.

Accordingly, **IT IS ORDERED** that all relief requested in the motion (Doc. 528) is **DENIED**.

### 

---

[3] Bankruptcy Rule 2014 implements the disinterestedness provision of § 327(a) by requiring professional persons to make certain disclosures at the time they seek approval of their employment. Specifically, a professional must set forth any "connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a). Under the rule, a professional must disclose all "connections" with parties in interest. Failure to disclose the required connections can warrant disqualification and disgorgement of any compensation already received.